## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03164

CRAIG MILLER, an individual,

Plaintiff

v.

NATIONAL JEWISH HEALTH, a Colorado nonprofit corporation

Defendant

---

## COMPLAINT AND JURY DEMAND

---

COMES NOW the Plaintiff, Craig Miller ("Mr. Miller"), by and through his attorneys, Miller & Law, PC, and for his Complaint against the Defendant, National Jewish Health ("NJH," the "Company," or "Defendant"), states as follows:

## NATURE OF THE ACTION

This action is brought to redress NJH's violation of: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e. Specifically, the Plaintiff alleges that NJH engaged in unlawful employment practices on the basis of Mr. Miller's male gender, retaliated against Mr. Miller for engaging in protected activities – including his complaints of gender-based discrimination, harassment and retaliation - by creating and escalating a hostile work environment and singling him out for mistreatment, culminating in the termination of Mr. Miller's employment, in violation of Title VII.

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(j).

2.      The unlawful employment practices and defamatory acts alleged herein were committed within the jurisdictional boundaries of the United States District Court for the District of Colorado and venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3).

## ADMINISTRATIVE PREREQUISTIES

3.      Prior to filing this Complaint, Plaintiff complied with all procedural prerequisites for bringing this lawsuit.  He timely filed a charge of employment discrimination against NJH with the Colorado Civil Rights Division and the United States Equal Employment Opportunity Commission ("EEOC") within 300 days of certain of the discrimination and/or retaliation to which he was repeatedly subjected.

4.      On or about August 31, 2021 Plaintiff was issued a Notice of Right to Sue by the EEOC with respect to his charge of employment discrimination against NJH.

5.      The filing date of this Complaint is within 90 days of Plaintiff's receipt of the Notice of Right to Sue that the EEOC issued to Plaintiff.

6.      Plaintiff has satisfied all procedural prerequisites for suing NJH in federal court under 42 U.S.C. §2000e-5(f)(1).

## PARTIES

7.      Mr. Miller is an individual resident of Colorado with a residential address of 17237 E Dorado Drive, Centennial, CO 80015.

8.      NJH is a Colorado nonprofit corporation, with its headquarters located at 1400 Jackson St., Denver, CO 80206.  NJH employs more than 1,700 employees.

## GENERAL ALLEGATIONS

9.      Mr. Miller began working at NJH as a Clinical Pathology Specialist within the

Clinical Pathology Department on October 29, 2012.

10.     The genesis of Mr. Miller's claims is tied to NJH's promotion of David Heinz to the position of Histology Supervisor on March 16, 2015, at which time Mr. Heinz began supervising Mr. Miller, as well as another female Clinical Pathology Specialist and a female Pre-Analytical Technician.

11.     Mr. Miller initially had applied to Histology Supervisor position as well, but eventually withdrew his name from consideration for that position.

12.     Following his promotion, Mr. Heinz – a first-time manager - began targeting Mr. Miller, and he has proceeded to escalate his disparate treatment of Mr. Miller over the next five years.

13.     Mr. Heinz has a preference for female subordinates instead of male subordinates.

14.     On information and belief, Mr. Heinz's preference for female subordinates is based on his belief that women are easier for him to control.

15.     Under Mr. Heinz's supervision, NJH engaged in disparate treatment of Mr. Miller on the basis of his male gender in many different ways.

16.     For example, despite providing annual raises to Mr. Miller's similarly situated female counterparts and timely completing their annual evaluations during their anniversary month of February each and every year, Mr. Heinz refused to give Mr. Miller any raises during the five years that he was Mr. Miller's supervisor, other than a single 2.8% cost-of-living raise in 2016 – a raise that NJH delayed in implementing for 15 months.

17.     Mr. Miller's annual compensation thus remained static at approximately $70,000.00 for almost the entire period that Mr. Heinz was his supervisor.

18.     Mr. Heinz consistently delayed Mr. Miller's evaluations by a significant period,

ranging from between four months to fifteen months after his October anniversary month each year; Mr. Miller's evaluation for 2016-2017, which was supposed to have taken place in October 2017, did not take place until January 2018.

19.     On April 1, 2019, Mr. Heinz hired a woman, Lin Le, to replace two former female employees.

20.     Mr. Heinz thereafter continually sought to replace Mr. Miller with two other women who have been working for NJH on a research grant: Jane Parr and Kathy Matzen.

21.     Mr. Heinz's concerted effort to fire Mr. Miller or to force him to quit gained additional vigor by October 2019, with the upcoming February 2020 expiration of the research grant on which Ms. Parr and Ms. Matzen were working.

22.     NJH repeatedly informed Mr. Miller that Mr. Heinz fully intended to hire Ms. Parr and Ms. Matzen into the lab when their research grant expired.

23.     Dr. Kevin Brown, the Chair of NJH's Department of Medicine, likewise had committed to Ms. Parr and Ms. Matzen that they would move to Mr. Miller's department upon the expiration of their research grant.

24.     In stark contrast, NJH was equivocal as to its plans for Mr. Miller; Mr. Heinz suggested vaguely that he would see how Mr. Miller might possibly "fit into the equation."

25.     Spearheaded by Mr. Heinz, and with assistance along the way from the HR Department, NJH went full-steam ahead with its plan to terminate Mr. Miller's employment or to force him to quit.

26.     As the next step in this gender-driven scheme, NJH and/or Mr. Heinz fabricated the need for an improvement plan for Mr. Miller in late October 2019; this improvement plan was the latest step in a series of targeted retaliation against Mr. Miller.

27.     Mr. Miller repeatedly brought this retaliation to the attention of NJH's Human Resources Department throughout 2019.

28.     Notwithstanding his complaints, NJH's Human Resources Department did little or nothing to help Mr. Miller; to the contrary, the Department participated in and perpetuated the retaliation and mistreatment against him.

29.     On January 9, 2019 Mr. Miller complained to NJH's Sarah Hartman and Julie Banta that Mr. Heinz was several months late yet again in providing Mr. Miller's annual evaluation.

30.     On February 12, 2019 Mr. Miller met again with Ms. Hartman and Ms. Banta to complain that his female colleagues were receiving timely evaluations, while his evaluations were being significantly delayed, in addition to receiving raises that Mr. Miller was not receiving.

31.     Mr. Miller further reported the growing hostility, discrimination and retaliation from Mr. Heinz, which had escalated considerably from March 2017, when Mr. Miller had first raised his concerns with NJH's HR.

32.     In response, Ms. Hartman falsely assured Mr. Miller that Mr. Heinz would not retaliate further against him while HR was looking into the complaints; she suggested that if additional retaliation occurred, Mr. Miller should simply notify her again.

33.     Just one month after Mr. Miller's second complaint to HR, on March 15, 2019, Mr. Heinz proceeded with Mr. Miller's October 2018 review.

34.     Not only was the substance of the October 2018 review decidedly retaliatory, Mr. Heinz erupted against Mr. Miller during the meeting.

35.     After summoning Mr. Miller into his office late that Friday afternoon to discuss his 2018 review evaluation, Mr. Heinz recklessly tossed the evaluation papers across the desk toward Mr. Miller as Mr. Miller sat down.

36.     Mr. Heinz then pushed for Mr. Miller to execute the signature page without even having had an opportunity to review its contents.

37.     Mr. Heinz declared that he was not going to discuss the evaluation, remarking, "well of course you are not going to like it."

38.     Upon briefly skimming through the evaluation papers, Mr. Miller asked, "what does this mean?"

39.     After initially ignoring Mr. Miller's inquiry, Mr. Heinz started walking away from Mr. Miller, then abruptly whipped around in an aggressive manner and yelled, "I don't have to g*d d**n talk to you about this or anything further - about anything!"

40.     Mr. Miller was stunned by Mr. Heinz's aggression and hostility.

41.     Mr. Heinz continued yelling and screaming at Mr. Miller, quickly becoming red faced as he accused Mr. Miller of being nothing but a "f**king problem," then he screamed that Mr. Miller did nothing to make things "f**king easier" for him.

42.     Mr. Heinz completely lost control of his emotions as he continued swearing and ranting at Mr. Miller; he warned Mr. Miller that he "better stop f**king things up" or else he would be fired for insubordination - or anything else that Mr. Heinz could think of to get rid of Mr. Miller.

43.     Mr. Heinz falsely accused Mr. Miler of causing two female employees to quit, and told Mr. Miller that he would have to do the work of these two employees going forward, as a result.

44.     Mr. Heinz further warned Mr. Miller that he could make things "more and more difficult" for Mr. Miller, to force him to quit, or to pile on job duties to set Mr. Miller up for failure so that Mr. Heinz could terminate him and then "pick his own staff."

45.     Mr. Heinz continued on with his tirade, screaming at Mr. Miller: "if you think I'm

mad now, you haven't seen anything yet!"

46.     On the following Monday, Mr. Heinz reiterated his threats to Mr. Miller during a meeting attended by Ms. Parr, Ms. Matzen as well as two additional individuals who were not part of Mr. Miller's group - in which Mr. Heinz announced that, "Craig and I had a fight on Friday afternoon and this paper is the result of it."

47.     Mr. Heinz informed everyone in attendance at the meeting that he had changed all of Mr. Miller's duties, and that Mr. Miller would be working longer hours now that the department was short-staffed.

48.     Mr. Heinz further announced to the meeting attendees that if Mr. Miller did not like this, he could either "go to HR, quit or move to more write-ups to get yourself terminated."

49.     Mr. Heinz thereafter required Mr. Miller to work as many as 60 hours per week, without additional compensation.

50.     NHJ's Human Resources Department took no meaningful action in response to Mr. Miller's ongoing complaints of discrimination and retaliation.

51.     Mr. Miller inquired with Ms. Hartman and Ms. Banta on March 19, 2019 as to the status of their investigation of his complaints of discrimination presented on January 9 and February 12, 2019.

52.     Mr. Miller had asked NJH to resolve the issue of his past evaluations and to look into discrimination and favoritism with women in the department with respect to raises, evaluation timing, workload, time off, and flexible departure times; for example, Mr. Miller still had not received his 2017 merit raise even as of 2019.

53.     Instead of addressing and resolving Mr. Miller's concerns, Ms. Hartman and Ms. Banta engaged in stonewalling.

54.     Eventually, on April 3, 2019, Ms. Hartman informed Mr. Miller that - despite not having conducted any interviews regarding his complaints - she nevertheless had concluded that his claims were "unfounded."

55.     Mr. Heinz's retaliation and discrimination against Mr. Miller continued unabated.

56.     For example, on July 22, 2019, Mr. Heinz presented Mr. Miller with a "Progressive Discipline Form," which alleged – in the absence of any proof and without affording Mr. Miller any opportunity to rebut the write-up prior to its issuance - that Mr. Miller supposedly had mishandled biopsies from two different patients on a single day.

57.     Mr. Heinz maintained the write-up despite the fact that (i) Mr. Miller was not the only individual involved in handling those matters, (ii) a machine may have caused or contributed to these issues, and (iii) Mr. Miller had previously handled over 7,200 biopsies without incident; although Mr. Heinz conceded the validity of these points, he claimed that he had been instructed by NJH's Medical Director, Steve Groshong, M.D., to write Mr. Miller up.

58.     Mr. Heinz continued his practice of ending virtually every meeting with Mr. Miller by exclaiming, "if you don't like it, then quit!"

59.     On October 7, 2019, during the week before an inspection of the lab by its accreditation agency, NJH issued Mr. Miller a "Personal Accountability Reminder Two."

60.     The write-up was replete with baseless accusations, and in fact did not follow up on any previously issued warning.

61.     Although Mr. Heinz refused to explain the progressive nature of the write-up, he did warn Mr. Miller that a third such write-up would result in his termination.

62.     On October 29, 2019 – which marked the first time in his five years of working for Mr. Heinz that he had received a timely evaluation – Mr. Miller was issued by far his most negative

evaluation throughout his seven years of employment at NJH.

63.     This contrived negative evaluation transparently was intended by NJH as a device to facilitate Mr. Miller's resignation or termination.

64.     Tellingly, despite the negative evaluation, Mr. Heinz initially did not find it necessary to create an Action Plan to improve Mr. Miller's allegedly deficient performance; instead, Mr. Heinz remarked that "this just needs to be documented so we can go forward with things."

65.     During this discussion, Mr. Heinz made a revealing impromptu assertion to Mr. Miller, remarking: "so you know, I'm not *trying* to get you fired!"

66.     Two days later, however, Mr. Heinz had second thoughts about this dubious approach, notifying Mr. Miller on October 31, 2019 that an action plan would be necessary, after all.

67.     After Mr. Miller sent a follow-up email on November 12, 2019 reiterating his growing concerns about the hostile work environment and retaliation to which he was being subjected by Mr. Heinz, Ms. Hartman directed Mr. Miller to meet with her and Ms. Banta on November 13, 2019.

68.     In an intimidating fashion, Ms. Hartman raised her voice and declared that they were not going to "waste any more time" discussing Mr. Miller's discrimination and harassment complaints.

69.     Ms. Hartman remarked that Mr. Miller did not understand "what a 'real' hostile work environment" is, that there had been no retaliation against him whatsoever, and that he had to "move on."

70.     Ms. Hartman further indicated that if Mr. Miller did not participate in the

Development Action Plan resulting from the negative performance evaluation at 1:00 pm that day, he would be terminated immediately; Ms. Hartman repeated her warning twice more, raising her voice with each additional rendition.

71.     Ms. Hartman also repeated the same mantra frequently utilized by Mr. Heinz: "if you don't like it, you can quit."

72.     Near the conclusion of the intense, 30-to-40-minute meeting on November 13, 2019, Ms. Hartman suggested that Mr. Miller could have "his lawyer" contact "our lawyer," before declaring emphatically, "we're done!"

73.     Mr. Miller walked out of the meeting, shell-shocked.

74.     For the next four weeks, Mr. Miller received no communications from Mr. Heinz, HR or anyone else indicating that there were any lingering concerns or outstanding issues regarding the Action Plan.

75.     Shortly before Mr. Miller was about to go on vacation, however, NJH abruptly informed him on December 16, 2019 that he had to "fix his ways" immediately or else he would be terminated.

76.     During this December 16, 2019 meeting, which took place in Ms. Banta's office, Mr. Heinz exploded against Mr. Miller yet again.

77.     This time, Mr. Heinz accused Mr. Miller of making the majority of the mistakes in the lab and jeopardizing the lab's accreditation, boasting that it was only through his own actions that the lab had avoided losing its accreditation.

78.     When Mr. Miller pointed out that Mr. Heinz himself had made numerous mistakes, he quickly became profoundly agitated, and he started to stand up as he began screaming at Mr. Miller in Ms. Banta's direct presence.

79.     Mr. Heinz screamed that Mr. Miller was a "liar" who needed "to get out of the department."

80.     Mr. Heinz became so violently angry during the December 16, 2019 meeting that Mr. Miller feared that Mr. Heinz was about to grab Mr. Miller's right arm; Ms. Banta looked on with sheer terror.

81.     Mr. Heinz continued yelling unintelligible remarks before eventually running out of steam, at which time Ms. Banta ended the meeting and excused Mr. Miller from her office, while directing Mr. Heinz to "hold back" and not walk out with Mr. Miller.

82.     Mr. Miller was so distraught by this latest attack and outburst by Mr. Heinz that he took the next three days as sick days, before beginning his scheduled vacation on December 21, 2019.

83.     Mr. Miller sent an email to Mr. Heinz on December 18, 2019 that indicated that Mr. Miller needed to take some time off, as he was experiencing health concerns.

84.     Concurrently, NJH's Benefits Specialist, Lori Casey, left a voice message for Mr. Miller later on December 18, 2019 asking him to contact her regarding taking FMLA leave.

85.     Ms. Casey explained that she had "heard from somebody in HR" that Mr. Miller might need to take "some longer time off."

86.     On information and belief, NJH's latest strategy was to attempt to get Mr. Miller to take FMLA leave and to replace him with Ms. Parr and Ms. Matzen, initially on an interim basis, but with every intention of finally making this a permanent replacement; as a result, Mr. Miller declined to go on FMLA leave.

87.     On January 6, 2020, which was Mr. Miller's first day back in the lab, Ms. Banta and Mr. Heinz met with him again.

88.     Ms. Banta started by saying that what happened at the December 16, 2019 meeting was not going to happen again; she assured Mr. Miller that Mr. Heinz would not raise his voice or yell at Mr. Miller, and that he would not speak to Mr. Miller in a condescending manner again.

89.     Mr. Heinz then handed Mr. Miller a document entitled, "Final Memo," which indicated that Mr. Miller's employment would be terminated if he did not correct his performance within one month – which was precisely the point when it was anticipated that the research grant that Ms. Parr and Ms. Matzen were working on would be coming to an end.

90.     Mr. Miller pointed out that during the seven weeks since November 18, 2019, there had been no concerns expressed regarding his performance in the context of the Action Plan, and now he was being given exactly one month to improve "everything."

91.     Ms. Banta responded by suggesting that Mr. Miller should have asked Mr. Heinz whether he was meeting expectations.

92.     As it turned out, in late January, the research grant was extended until May 31, 2020, a development that seemed to briefly reduce Mr. Heinz's passion for harassing Mr. Miller, following a month in which he had mercilessly berated Mr. Miller and made every effort to make the work environment as miserable and as hostile for him as possible.

93.     During the seven weeks that followed, however, Mr. Heinz recommenced his harassment, regularly urging Mr. Miller to "just quit," since "you are going to be fired, anyway."

94.     In the wake of the COVID-19 outbreak, Mr. Miller questioned Mr. Heinz on March 20, 2020 as to how the pandemic would impact their department.

95.     Mr. Heinz responded that everyone in the department is considered "essential," and asserted that everyone would be continuing to perform their work as they had been doing all along.

96.     Three days later, however, on March 23, 2020, Mr. Heinz informed Mr. Miller that

there was "no work" for him to do in the lab and because of COVID-19, Mr. Miller was being "laid off for two weeks," until April 6, 2020.

97.     Upon being questioned by Mr. Miller, Mr. Heinz rephrased the action as a "furlough" and told Mr. Miller that he could take vacation hours or receive no pay.

98.     According to Mr. Heinz, Ms. Le, Ms. Parr and Ms. Matzen were being furloughed as well, but he then qualified his response by saying that Ms. Le was "sort of" being furloughed, noting that her salary was lower than Mr. Miller's, so she could come back sooner than Mr. Miller.

99.     When Mr. Miller expressed that it sounded like Mr. Heinz was just going to keep putting off his return-to-work indefinitely, Mr. Heinz abruptly walked away from Mr. Miller after ordering him to leave the work premises immediately.

100.    Just before Mr. Miller's scheduled return-to-work on Monday, April 6, 2020, Mr. Heinz called Mr. Miller on Friday afternoon, April 3, 2020, to report that he needed to be gone for one additional week because Mr. Heinz had "no work" for him to do.

101.    Mr. Miller inquired whether this extended absence applied to Ms. Le, Ms. Parr and Ms. Matzen as well; Mr. Heinz admitted that Ms. Parr and Ms. Matzen had been working the entire time, "doing projects and helping out in the clinical lab," and that Ms. Le had been working since March 24.

102.    When Mr. Miller pointed out that he was once again uniquely being singled out, this time in the context of the furlough, Mr. Heinz stated that it was "easier this way, and, frankly, I really don't like working with you anyway," before abruptly ending the call.

103.    On April 13, 2020, Mr. Heinz and Ms. Banta informed Mr. Miller that the terms of his furlough were being changed, effective immediately; they explained that Mr. Miller was being furloughed through May 31, 2020 as part of a "non-essential group" of employees.

104.    While virtually all of that group of employees have received 70% pay while being furloughed, NJH refused to pay Mr. Miller any compensation during this additional furlough, purportedly as a result of Mr. Miller having been placed on an Action Plan in 2019.

105.    Another group of "essential" employees were retained to continue working at NJH with full pay.

106.    As a consequence of this revised furlough plan, Mr. Miller was forced to use his unused vacation pay.

107.    Ms. Banta subsequently informed Mr. Miller that his furlough was being extended "indefinitely."

108.    Mr. Miller was the only member of his department who was kept out of work since late March 2020; all or virtually all other department members were allowed to continue working at NJH throughout the first few months of the pandemic.

109.    After Mr. Miller further complained to NJH about this disparate treatment on June 26, 2020 and further expressed his concerns about the prospect of enduring further retaliation, hostility and abuse from Mr. Heinz if he were to return to work, NJH separated Mr. Miller's employment on June 30, 2020 without notifying him.

110.    Between 2015 and 2020, following Mr. Miller's repeated complaints and communications with NJH's Human Resources Department, the Company revealed private and personal information of Mr. Miller to numerous NJH employees, information that NJH had specifically promised Mr. Miller would be held in strict confidence.

111.    Mr. Miller felt victimized by the manner in which NJH had betrayed his trust in this regard, and he further complained to NJH about this betrayal of confidence.

112.    On July 6, 2020, Mr. Miller, through counsel, further apprised NJH of the

discrimination, retaliation and hostile work environment to which Mr. Miller was being subjected.

113.    Although NJH claims to have investigated Mr. Miller's claims and interviewed staff before concluding that Mr. Miller's complaints could not be substantiated, NJH repeatedly declined Mr. Miller's requests for information concerning its purported "investigation."

114.    On July 30, 2020, Mr. Miller filed his Charge of Discrimination with the EEOC.

115.    Four days after filing his EEOC Charge, on August 3, 2020, NJH advised Mr. Miller of the findings of its "investigation" and was directed to return to work on August 17, 2020, failing which NJH would assume that Mr. Miller had voluntarily resigned.

116.    NJH refused to provide any information to Mr. Miller regarding the steps taken as part of the alleged "investigation."

117.    Mr. Miller advised NJH by email on August 13, 2020 of the following:

Respectfully, NJH's unsubstantiated "assurances" mean nothing to me at this point. I have been told for several years that discrimination and harassment are not tolerated at NJH, that I would not be treated any differently in the wake of reporting my complaints, and that I accordingly could bring my concerns to NJH's attention without fear of reprisal.

Unfortunately, these assurances have proven to be entirely hollow; my complaints have only resulted in my being subjected to additional discrimination and harassment – to the point that I have been forced to file an EEOC Charge of Discrimination.

To be very clear: I am not voluntarily resigning.  Before it would make sense for me to return to work as NJH is demanding, however, NJH must actually address and resolve this situation, and *show me* that this is really happening. Empty phraseology simply will not cut it.

118.    When Mr. Miller did not return to work on August 17, 2020, NJH notified Mr. Miller that it was "accepting his resignation."

119.    Mr. Miller thereafter explained to NJH yet again on August 18, 2020 that he was not resigning, and he pointed out that NJH's actions merely further confirmed that NJH never had any intent to remedy the discrimination, harassment and retaliation to which it had continually

subjected Mr. Miller, and that NJH continually went out of its way to escalate this illegal mistreatment of Mr. Miller at every turn.

120.  In its Position Statement that it filed with the EEOC, NJH falsely maintained that Mr. Miller had resigned as of August 17, 2021.

121.  As a direct and proximate result of NJH's illegal acts, Mr. Miller has suffered severe financial and emotional distress.

## CLAIMS FOR RELIEF

### First Claim For Relief
### Gender Discrimination in Violation of Title VII

122.  Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

123.  NJH, directly and/or through its agents, discriminated against Mr. Miller during his employment on the basis of his male gender, as described herein.

124.  NJH, through Mr. Heinz, is one of those "unusual employers that discriminates against the majority" with respect to its discrimination against Mr. Miller on the basis of his male gender.

125.  As described *infra,* during his employment, as well as in terminating his employment, NJH treated Mr. Miller in a disparate fashion than one or more similarly-situated female colleagues, including but not limited to the unequal manner in which NJH determined Mr. Miller's pay.

126.  NJH's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Mr. Miller's federally protected rights.

127.  As a consequence of NJH's illegal conduct, Mr. Miller suffered, and continues to

suffer, irreparable injury and damages.

## Second Claim For Relief
### Hostile Work Environment in Violation of Title VII

128.    NJH (directly and/or through Mr. Heinz) created a hostile work environment for Mr. Miller (the "Hostile Work Environment") that was permeated with intimidation, ridicule, and insult.

129.    In creating the Hostile Work Environment, NJH (directly and/or through Mr. Heinz) was directly motivated by Mr. Miller's male gender.

130.    The Hostile Work Environment was unwelcomed by Mr. Miller.

131.    The Hostile Work Environment was sufficiently severe or pervasive to alter the conditions of Mr. Miller's employment and create an abusive working environment.

132.    Mr. Miller perceived the Hostile Work Environment to be abusive or hostile.

133.    A reasonable man in Mr. Miller's circumstances would consider his work environment at NJH to be abusive or hostile.

134.    NJH's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Mr. Miller's federally protected rights.

135.    As a consequence of NJH's illegal conduct, Mr. Miller suffered, and continues to suffer, irreparable injury and damages.

## Third Claim For Relief
### Retaliation in Violation of Title VII

136.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

137.    Mr. Miller engaged in protected activities by complaining to NJH of gender discrimination and retaliation.

17

138.    As described *infra,* Mr. Miller was subjected to retaliation by NJH in numerous ways as a result of engaging in the foregoing protected activities, including through being terminated from his employment.

139.    NJH's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Mr. Miller's federally protected rights.

140.    As a consequence of NJH's illegal conduct, Mr. Miller suffered, and continues to suffer, irreparable injury and damages.

### Additional Claims For Relief

141.    Plaintiff reserves the right to add additional claims after discovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and

against Defendant, and award Plaintiff the following relief, to the fullest extent allowed by law:

i.    Actual monetary damages for all injuries suffered by Plaintiff in an amount to be determined at trial, including but not limited to, damages for lost past and future wages and employment benefits;

ii.   Punitive damages on all claims allowed by law and in an amount to be determined at trial;

iii.  Attorneys' fees and costs, including expert witness fees, on all claims allowed by law;

iv.   Pre- and post-judgment interest at the highest lawful rate; and

v.    Any further relief that this court deems just and proper, and any other relief as allowed by law.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 23rd day of November 2021.

MILLER & LAW, PC

**/s/ David J. Meretta**
David J. Meretta, No. 44409
1900 W. Littleton Blvd.
Littleton, CO 80120
(303) 722-6500
(303) 722-9270 fax
djm@millerandlaw.com

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:

17237 E Dorado Drive
Centennial, CO 80015

19