**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-03164-NYW-NRN

CRAIG MILLER,

     Plaintiff,

v.

NATIONAL JEWISH HEALTH,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on the Motion for Summary Judgment ("Motion" or "Motion for Summary Judgment"), [Doc. 46], filed by Defendant National Jewish Health ("Defendant" or "NJH").  Upon review of the Motion and the related briefing, the applicable case law, and the entire record, the Court concludes that oral argument will not materially assist in the resolution of this matter.  For the reasons set forth below, Defendant's Motion for Summary Judgment is respectfully **GRANTED**.

### BACKGROUND

In this action, Plaintiff Craig Miller ("Plaintiff" or "Mr. Miller") claims that his former employer, NJH, violated Title VII of the Civil Rights Act of 1964 ("Title VII") by discriminating against him on the basis of his gender, subjecting him to a hostile work environment, and retaliating against him for engaging in protected opposition to gender discrimination.  [Doc. 20 at 16–20].  Plaintiff sued NJH on November 23, 2021.  [Doc. 1].  Mr. Miller subsequently filed an Amended Complaint ("Amended Complaint"), [Doc. 20],

asserting claims for reverse gender discrimination ("Count I"), hostile work environment ("Count II"), and retaliation ("Count III") under Title VII, which NJH answered on May 4, 2022, [Doc. 31].  NJH now moves for summary judgment on all three of Plaintiff's claims. [Doc. 46].  Plaintiff has filed a Response opposing NJH's Motion for Summary Judgment ("Response"), [Doc. 47], to which NJH has replied, [Doc. 48].  Accordingly, the matter is fully briefed and ripe for this Court's review.

## UNDISPUTED MATERIAL FACTS

The below material facts are drawn from the Parties' briefing and the record before the Court and are undisputed unless otherwise noted.[1]

1.      Plaintiff began working at NJH as a Clinical Pathology Specialist on October 29, 2012.  [Doc. 46 at ¶ 1; Doc. 47 at 1; Doc. 46-1 at 62:8–15].[2]

2.      Around March 2015, David Heinz ("Mr. Heinz") became the Histology Supervisor and began supervising Plaintiff.  [Doc. 46 at ¶ 3; Doc. 47 at 1; Doc. 46-1 at 78:11–16].

---

[1] As the Parties list 80 material facts, many of which are framed as disputed to varying degrees, the Court limits its discussion at this stage to those facts that are material to resolving the instant Motion.  Additionally, the Parties identify several disputes of fact that, on several occasions, only demonstrate denial of a specific portion of a statement of fact without admitting the remaining undisputed portion, in contravention of Rule 56(c) of the Federal Rules of Civil Procedure and NYW Civil Practice Standard 7.1D(b).  When this is the case, the Court accepts the portions that are not objected to or otherwise disputed as undisputed without further note.

[2] When citing to transcripts, the Court cites to the document number generated by the Electronic Court Filing ("ECF") system but to the page and line numbers appearing on the transcript.  In all other instances, the Court cites to the page numbers generated by the ECF system.

3.      From October 2015 through the beginning of 2019, two female employees also reported to Mr. Heinz:  Jenna Case Schuman ("Ms. Schuman")[3] and Norma Aumen ("Ms. Aumen").  [Doc. 46 at ¶ 8; Doc. 47 at 1; Doc. 46-1 at 95:3–5, 159:17–160:8; Doc. 47-4 at 6].

4.      On October 23, 2015, Mr. Heinz gave Mr. Miller a favorable performance evaluation for the 2014–2015 review period (the "2014–2015 Evaluation").  [Doc. 46 at ¶ 4; Doc. 47 at 2; Doc. 46-1 at 87:18–89:2; Doc. 47-5 at 10–13]; *see also* [Doc. 47 at ¶ 52; Doc. 48 at 3].  Because Mr. Heinz had only been Mr. Miller's supervisor for roughly seven months at the time of the review and "wanted to start on a positive note," he gave Plaintiff "every benefit of the doubt."  [Doc. 46 at ¶ 5; Doc. 47 at 2; *id.* at ¶ 58; Doc. 48 at ¶ 58; Doc. 47-3 at 28:17–29:15; Doc. 46-1 at 87:18–89:11].  Based on the 2014–2015 Evaluation, Mr. Miller was awarded a 2.5 percent merit increase.  [Doc. 47 at ¶ 58; Doc. 48 at ¶ 58; Doc. 47-5 at 13].

5.      In addition to the 2014–2015 Evaluation, Mr. Miller had previously received two other positive performance evaluations from his supervisors at NJH.  [Doc. 47 at ¶ 60; Doc. 48 at ¶ 60; Doc. 47-5 at 2–9 (evaluations completed by Jan Henson and Steve Groshong ("Mr. Groshong"))].[4]

---

[3] There appears to be some discrepancy as to the proper spelling of Ms. Schuman's last name.  *Compare* [Doc. 46 at ¶ 8 ("Jenna Case Shuman")], *with* [Doc. 47 at 2 (referring to "Ms. Schuman"); Doc. 48 at ¶ 65, *id.* at 8 (using both spellings)].  For purposes of this Motion, the Court will use the spelling from the deposition transcript excerpts appended to the Parties' briefs.  *See, e.g.*, [Doc. 46-2 at 50:20; Doc. 47-3 at 33:25–34:1].

[4] The Court does not consider as undisputed fact Mr. Miller's characterization of Mr. Heinz's subsequent negative evaluations of Plaintiff as being in "direct[] conflict with specific prior observations of Mr. Miller that had been made by Mr. Miller's supervisors at NJH—including by Mr. Heinz himself."  *See* [Doc. 47 at ¶ 60].  Such argument is improper, given that the purpose of this portion of the briefing is to identify material *facts*, whether disputed or not, in order to resolve NJH's Motion for Summary Judgment.  *See, e.g.*,

6.      In early October 2015, Mr. Heinz lost a biopsy while working at a station with Mr. Miller (the "Biopsy Incident").   [Doc. 46 at ¶ 6; Doc. 47 at 1; Doc. 46-1 at 79:11–81:25]; *see also* [Doc. 47 at ¶ 70; Doc. 48 at 3; Doc. 47-3 at 84:22–86:18].   Mr. Heinz said he would report the incident to his supervisor.   [Doc. 46 at ¶ 6; Doc. 47 at 1; Doc. 46-1 at 79:11–81:25].   A few weeks later, Mr. Miller followed up with Mr. Heinz to ensure he had reported the incident, believing that Mr. Heinz wanted to sweep it under the rug.   [Doc. 46 at ¶ 6; Doc. 47 at 1; Doc. 46-1 at 79:11–81:25].   At this moment, Plaintiff's relationship with Mr. Heinz "soured."   [Doc. 46 at ¶ 6; Doc. 47 at 1; Doc. 46-1 at 81:23–81:25].

7.      Within six to eight months of starting as Histology Supervisor at NJH, Mr. Heinz determined that Mr. Miller was not doing what he needed to be doing.   [Doc. 47 at ¶ 59; Doc. 48 at 3; Doc. 47-3 at 29:5–19, 32:6–33:24].

8.      By January 2016, Mr. Heinz had raised concerns with NJH's Human Resources Department ("HR" or the "HR Department") about Mr. Miller's performance. [Doc. 47 at ¶ 62; Doc. 48 at ¶ 62; Doc. 47-3 at 89:10–92:2].

9.      Mr. Heinz subsequently delivered a Progressive Discipline Form to Mr. Miller on February 1, 2016, for "[f]ailure to complete assigned job" (the "February 2016 Progressive Discipline Form").   [Doc. 47 at ¶ 62; Doc. 48 at ¶ 62; Doc. 47-3 at 92:24–94:18; Doc. 47-7 at 1–2].   As justification, Mr. Heinz explained in the form that he

---

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671–72 (10th Cir. 1998) (finding conclusory statements and attorney arguments submitted by the nonmoving party do not create a genuine issue of material fact); *see also* NYW Civ. Practice Standard 7.1D(b)(7) ("Legal argument is not permitted [in the Parties' factual recitations] and should be reserved for separate portions of the briefs.").   With reference to these evaluations, the Court separates Mr. Miller's factual recitations from his characterizations of the evaluations' content.

and Mr. Miller had met in December to review Plaintiff's "job performance," and, at that meeting, Mr. Miller had "seemed unsure [of] what [he was] expected to do," so Mr. Heinz had provided him with "a specific list of core job requirements." [Doc. 47 at ¶ 62; Doc. 48 at ¶ 62; Doc. 47-3 at 92:24–94:18; Doc. 47-7 at 1]. In Mr. Heinz's view, since that December 2015 meeting, Mr. Miller had not made a "serious attempt" to complete the listed job requirements, and the then-current backlog of slides was "unacceptable." [Doc. 47 at ¶ 62; Doc. 48 at ¶ 62; Doc. 47-3 at 92:24–94:18; Doc. 47-7 at 1]. The February 2016 Progressive Discipline Form advised Plaintiff that his "[f]ailure to meet expectations or any department standards [could] result in further disciplinary action, up to and including termination." [Doc. 47 at ¶ 67; Doc. 48 at ¶ 67; Doc. 47-3 at 96:6–12; Doc. 47-7 at 1].

10.     In early 2016, Mr. Heinz "raised his voice" at Plaintiff and grabbed Plaintiff's left arm in a room where microscopic slides were stored because he was upset about a backlog of slides (the "Slide Room Incident").[5] [Doc. 47 at ¶ 77; Doc. 48 at 3; Doc. 47-3 at 103:9–107:9, 109:2–24; Doc. 46 at ¶ 12; Doc. 47 at 1; Doc. 46-1 at 84:11–85:20].

11.     Mr. Miller never met all expectations listed on the February 2016 Progressive Discipline Form, in Mr. Heinz's view. [Doc. 47 at ¶ 67; Doc. 48 at ¶ 67; Doc. 47-3 at 95:4–18]. Mr. Heinz does not recall revisiting the expectations set forth in the February 2016 Progressive Discipline Form with Mr. Miller or informing Mr. Miller that he

---

[5] Although Plaintiff testified that this altercation occurred in March 2016, whereas Mr. Heinz believed the altercation must have occurred before he issued the February 2016 Progressive Discipline Form, both Mr. Heinz and Mr. Miller appear to be describing the same interaction that took place in the microscopic slide room in early 2016. *Compare* [Doc. 46-1 at 84:11–86:3], *with* [Doc. 47-3 at 103:9–107:9, 109:2–24]. The Court finds that whether the Slide Room Incident occurred in March 2016 or earlier is immaterial to the resolution of the instant Motion.

was no longer subject to termination in connection with the expectations.[6]  [Doc. 47 at ¶ 67; Doc. 47-3 at 96:13–97:4].

12.     Later that year, in an email dated August 8, 2016, Ms. Schuman complained to Mr. Heinz that Plaintiff lacked work ethic and demonstrated consistent lackluster performance.  [Doc. 46 at ¶ 9; Doc. 47 at 2; Doc. 46-1 at 93:21–95:21].  Her allegations arose from a week in which only she and Plaintiff were in the lab.  [Doc. 46 at ¶ 9; Doc. 47 at 2; Doc. 46-1 at 95:2–10].

13.     Mr. Heinz held a meeting with Plaintiff to discuss his performance during the week in question (the "August 2016 Performance Meeting").  [Doc. 46 at ¶ 11; Doc. 47 at 2; Doc. 46-1 at 104:13–19; 105:24–106:24]; *see also* [Doc. 46-1 at 42].  During the meeting, Mr. Heinz indicated that he intended to write Plaintiff up,[7] but ultimately relented after Mr. Miller asked Mr. Heinz not to issue the write-up and promised he would "do better."  [Doc. 46 at ¶ 11; Doc. 47 at 2; Doc. 46-1 at 104:13–19, 105:24–106:24]; *see also* [Doc. 46-1 at 42].[8]  .

---

[6] This Court overrules Defendant's objection to the form of this line of questioning at Mr. Heinz's deposition, *see* [Doc. 48 at 5 n.6]—counsel did not state the basis for the objection, e.g., "compound" or "leading," and this Court does not independently find the form of the question objectionable.

[7] Plaintiff contends that Mr. Heinz "falsely asserted that [he] had 'substantiated'" the allegations against Mr. Miller that formed the basis of Ms. Schuman's complaint, despite purportedly having admitted that the badge reports did not confirm Ms. Schuman's accusations.  *See* [Doc. 47 at ¶ 66; *id.* at 2].  These assertions, the Court finds, are not borne out by the record.  At the pages cited by Plaintiff, Mr. Heinz merely testified that, based on the badge reports for the week in question, he had concluded that Mr. Miller "did not arrive at 4:30 [a.m.] and did not appear to stay much after 12:00 [p.m.]," but agreed that Plaintiff had arrived at the lab before 5:30 a.m. each day that week and that the badge reports did not indicate his departure time.  [Doc. 47-3 at 118:22–121:13].  The remaining transcript pages cited by Plaintiff, [Doc. 47-3 at 122:11–125:14], were not submitted to this Court.

[8] Plaintiff also seeks to add as an undisputed material fact that "Mr. Heinz did not follow through with the [write-up] because 'Craig said that he would like to move on with his life,

14.     Mr. Miller's performance evaluation for the 2015–2016 review period was due by October 16, 2016.  [Doc. 47 at ¶ 53; Doc. 48 at ¶ 53; Doc. 47-3 at 141:6–12].  Mr. Heinz, however, did not deliver the evaluation until April 2, 2017 (the "2015–2016 Evaluation").  [Doc. 47 at ¶ 53; Doc. 48 at ¶ 53; Doc. 47-4 at 6]; *see also* [Doc. 47-5 at 14–18].  In his evaluation, Mr. Heinz identified many areas where Plaintiff "fell short." [Doc. 46 at ¶ 13; Doc. 47 at 2; Doc. 46-1 at 110:19–111:20, 113:14–119:1].  Based on this review, Mr. Miller was not awarded a merit increase.  [Doc. 47 at ¶ 72; Doc. 48 at ¶ 72; Doc. 47-5 at 18].

15.     Because Mr. Miller had scored sufficiently low on his 2015–2016 Evaluation, a Performance Improvement Plan ("PIP") was required, which Mr. Heinz presented to Mr. Miller on April 2, 2017.[9]  [Doc. 47-3 at 134:22–135:6; Doc. 47-5 at 18; Doc. 47-7 at 3–4]. The PIP informed Mr. Miller that he would be reevaluated on June 12, 2017, and that if he did not improve his performance, he could be subject to further disciplinary action, up to and including termination, but Mr. Heinz never followed up with Mr. Miller.  [Doc. 47 at ¶ 68; Doc. 48 at 3; Doc. 47-3 at 136:14–137:20, 139:13–140:11, 156:19–23; Doc. 47-7 at 3–4].

16.     Mr. Miller complained to HR about Mr. Heinz on April 3, 2017.  [Doc. 47 at 3; Doc. 48; Doc. 47-1 at ¶ 7].

---

and this would make it hard for him to do that, and this would be impeding him [as a second written warning].'"  [Doc. 47 at ¶ 66 (second alteration in original)].  The portions of Mr. Heinz's deposition that Mr. Miller cites in support, however, were not submitted to this Court.

[9] Although neither Party presents this statement of fact as undisputed, the Court finds it is supported by record evidence and provides context necessary to understand the Parties' undisputed facts as stated.  Nevertheless, beyond providing background, the Court does not consider this a statement of material fact for purposes of resolving the instant Motion.

17.    Shortly thereafter, Ms. Aumen and Ms. Schuman both expressed concerns about Plaintiff to HR.  [Doc. 46 at ¶ 14; Doc. 47 at 3; Doc. 46-1 at 135:2–140:16]; *see also* [Doc. 47 at 3 (stating that Ms. Aumen and Ms. Shuman raised their concerns with HR shortly after Mr. Miller had complained to HR on April 23, 2017); Doc. 48 at 2; Doc. 47-1 at ¶ 7].[10]

18.    Plaintiff's performance evaluation for the 2016–2017 review period was due by October 16, 2017.  [Doc. 47 at ¶ 54; Doc. 48 at 3; Doc. 47-9 at 1].  Mr. Heinz ultimately delivered Mr. Miller's 2016–2017 evaluation on December 14, 2018 (the "2016–2017 Evaluation").  [Doc. 47 at ¶ 54; Doc. 48 at 3; Doc. 47-3 at 168:9–19, 185:10–17].  Because he was so late in completing the evaluation, Julie Banta ("Ms. Banta") instructed Mr. Heinz to give Mr. Miller a "fully successful" rating and the corresponding 2.8 percent merit increase for the review period, which Mr. Heinz would not otherwise have chosen to do.  [Doc. 47 at ¶ 56; Doc. 48 at ¶ 56; Doc. 47-3 at 31:15–32:5, 35:25–36:3, 186:8–23].

19.    During this period, Jane Parr ("Ms. Parr") and Kathy Matzen ("Ms. Matzen") also worked in Mr. Miller's lab but had different roles from Plaintiff.  [Doc. 46 at ¶ 17; Doc. 47 at 1; Doc. 46-1 at 202:3–6, 203:20–204:14].

20.    Mr. Miller recalled that, while working together in the lab in 2019, Ms. Parr would criticize Mr. Miller's work, saying, among other things, that Plaintiff needed to do

---

[10] Because there is no record evidence of the content of Ms. Auman's and Ms. Schuman's complaints, the Court cannot evaluate whether Mr. Miller's statement that these concerns "were entirely baseless" is supported by the record.  *See* [Doc. 47 at 3 (citing [Doc. 47-1 at ¶ 7 ("The concerns expressed by Ms. Aumen and Ms. Schuman in April 2017 were baseless.")])].  Nor does the Court consider as an undisputed fact Mr. Miller's belief that "these concerns were presented to HR at Mr. Heinz's direction."  [Doc. 47 at 3; Doc. 47-1 at ¶ 7]; *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat summary judgment, the nonmovant cannot rely on arguments of counsel or conclusory statements based on speculation, conjecture, or subjective belief.").

better in certain areas and pay attention.[11]  [Doc. 46 at ¶ 18; Doc. 47 at 3; Doc. 46-1 at 208:17–209:6].

22. In early 2019, Ms. Auman and Ms. Schuman both left NJH.  [Doc. 46 at ¶ 19; Doc. 47 at 1; *id.* at ¶ 74; Doc. 48 at ¶ 74; Doc. 46-1 at 159:12–160:8].

22. While employed at NJH, Ms. Aumen and Ms. Schuman had each received the maximum 2.8 percent annual merit increase in connection with each of Mr. Heinz's annual evaluations of their performance.  [Doc. 47 at ¶ 56; Doc. 48 at ¶ 56; Doc. 47-3 at 31:15–32:5; Doc. 47-4 at 6–7].

23. Prior to 2019, Plaintiff believed that Mr. Heinz was motivated to get Mr. Miller fired because of the Slide Room Incident, the August 2016 Performance Meeting, and because Mr. Miller had more technical experience than Mr. Heinz.[12]  [Doc. 46 at ¶ 20; Doc. 47 at 3; Doc. 46-1 at 199:5–201:19].

24. Plaintiff asserts that, after Ms. Auman's and Ms. Schuman's departure in 2019, Mr. Heinz's motivations for having Mr. Miller fired "took on the added reason of wanting to have a newer all-female staff."  [Doc. 46 at ¶ 21; Doc. 47 at 3; Doc. 46-1 at 201:13–19].  When asked about the basis for his belief, Plaintiff testified that Mr. Heinz "felt that [Mr. Miller] was not going to be . . . a fit in the laboratory, and did not want [Plaintiff]

---

[11] The Court disregards Mr. Miller's statement that "this criticism—which was entirely baseless—was presented at Mr. Heinz's direction."  [Doc. 47 at 3; Doc. 47-1 at ¶ 10 ("[Ms. Parr's] baseless accusations were nothing more than Ms. Parr acting as Mr. Heinz's puppet.")].  Such subjective beliefs and speculation cannot create a dispute of material fact.  *Bones*, 366 F.3d at 875.

[12] The Court does not credit Mr. Miller's unsupported assertion that "Mr. Heinz ultimately was intent on forcing Mr. Miller out based on Mr. Miller's gender, and Mr. Heinz's stated belief that women were easier for him to control."  [Doc. 47 at 3].  Mr. Miller's conjecture that this preference was, in fact, the reason Mr. Heinz wanted Mr. Miller fired cannot create a genuine dispute of material fact, *Bones*, 366 F.3d at 875.

specifically to be a part of [the lab]," and that Mr. Heinz "wanted to work with [Ms. Matzen] and [Ms. Parr] specifically."  [Doc. 46 at ¶ 21; Doc. 47 at 3; Doc. 46-1 at 201:16–205:25].

25.    Mr. Heinz had repeatedly expressed to Mr. Miller his preference for female subordinates and his desire to have an all-female staff, as reflected by his repeatedly stated belief that "women [we]re easier for him to control."  [Doc. 47 at 3; Doc. 48 at 2; Doc. 47-1 at ¶¶ 11–12].

26.    Although Mr. Miller's evaluation for the 2017–2018 review period was due October 16, 2018, Mr. Heinz did not deliver it to Mr. Miller until March 15, 2019 (the "2017–2018 Evaluation").  [Doc. 47 at ¶ 55; Doc. 48 at 3; Doc. 47-3 at 199:8–13].  Mr. Heinz rated Plaintiff's overall performance as "[p]artially [s]uccessful," and Plaintiff was awarded a one percent merit increase.  [Doc. 47 at ¶ 72; Doc. 48 at ¶ 72; Doc. 47-6 at 7]; *see also* [Doc. 46 at ¶ 16; Doc. 47 at 3; Doc. 46-1 at 161:9–165:12, 166:2-167:20].

27.    Additionally, Mr. Heinz admits that he "raised his voice" at Mr. Miller during the "fairly heated" meeting in which he delivered the 2017–2018 Evaluation.  [Doc. 47 at ¶ 78; Doc. 48 at ¶ 78; Doc. 47-3 at 199:8–200:20, 202:18–23].  Mr. Heinz also concedes that he may have sworn at Mr. Miller at some point during Plaintiff's employment.  [Doc. 47 at ¶ 78; Doc. 48 at ¶ 78; Doc. 47-3 at 150:3–7].

28.    On March 18, 2019, Mr. Heinz sent an email to Mr. Miller, on which Ms. Hartman, Mr. Groshong, Ms. Parr, and Ms. Matzen were copied, setting out Mr. Miller's "Daily work schedule."  [Doc. 47 at ¶ 74; Doc. 48 at ¶ 74; Doc. 47-1 at 45; Doc. 47-3 at 203:4–204: 23].  Although this email was not intended to punish or humiliate Mr. Miller in front of the other recipients, [Doc. 47 at ¶ 74; Doc. 48 at ¶ 74; Doc. 47-3 at 204:8–13], Plaintiff experienced it as such, [Doc. 47 at ¶ 74; Doc. 48 at ¶ 74; Doc. 47-1 at ¶ 51].

29.     In April 2019, NJH hired a female Clinical Pathology Specialist named Lin Le ("Ms. Le") to fill one of the positions made available by Ms. Auman's and Ms. Schuman's departure.  [Doc. 46 at ¶ 19; Doc. 47 at 1; Doc. 46-2 at 50:14–22].  Ms. Parr was, at some point, given the second open position.  [Doc. 47 at ¶ 49; Doc. 48 at 3; Doc. 47-3 at 49:19–51:6].

30.     Ms. Le was "less expensive" than Mr. Miller and never received discipline related to her performance.  [Doc. 46 at ¶ 32; Doc. 47 at 5; Doc. 46-1 at 231:14–21].

31.     On July 22, 2019, Mr. Heinz issued Mr. Miller another Progressive Discipline Form, in which he accused Mr. Miller of mishandling the biopsies from two different patients.  [Doc. 47 at ¶ 69; Doc. 48 at 3; Doc. 47-3 at 214:1–216:24; Doc. 47-7 at 5–6].  This form contained standard language advising Plaintiff that his "[f]ailure to meet expectations or any department standards w[ould] result in further disciplinary action." [Doc. 47 at ¶ 71; Doc. 48 at ¶ 71; Doc. 47-7 at 8].  Prior to July 2019, Mr. Miller had handled "many hundreds, if not thousands, of biopsies."  [Doc. 47 at ¶ 69; Doc. 48 at 3; Doc. 47-3 at 216:13–16].

32.     On October 7, 2019, Mr. Heinz delivered a disciplinary form titled "Personal Accountability Reminder Two" to Plaintiff, in which Mr. Heinz explained that, in his view, Mr. Miller was "not meeting the job expectations despite the coaching [he had] received," and advised Plaintiff that he was "no longer an employee in good standing and [that his] employment with [NJH wa]s in jeopardy."  [Doc. 47 at ¶ 71; Doc. 48 at ¶ 71; Doc. 47-7 at 9–12].  Mr. Heinz emphasized the importance of Mr. Miller's understanding that

"immediate and sustained improvement [wa]s necessary to protect [his] employment." [Doc. 47 at ¶ 71; Doc. 48 at ¶ 71; Doc. 47-7 at 11].[13]

33.    Mr. Heinz gave Plaintiff an overall rating of "unsuccessful" in his performance evaluation for the 2018–2019 review period, which Mr. Miller received on October 29, 2019 (the "2018–2019 Evaluation").[14]   [Doc. 46 at ¶ 22; Doc. 47 at 4; Doc. 46-1 at 212:5–215:12].   As a result, Plaintiff was not an employee in good standing and was required to draft a Developmental Action Plan ("DAP").   [Doc. 46 at ¶ 22; Doc. 47 at 4; Doc. 46-1 at 214:25–216:3].   Additionally, Plaintiff did not receive a merit increase for the evaluation period.[15]   [Doc. 47 at ¶ 72; Doc. 48 at ¶ 72; Doc. 47-6 at 14].

---

[13] The Court does not consider Mr. Miller's vague assertion that the various "evaluations and write-ups often were based on allegations for which there is no documentation." [Doc. 47 at ¶ 73].   As support for this statement, Plaintiff points only to one specific complaint cited in the April 2, 2017, Performance Improvement Plan, which Mr. Heinz admitted was not supported by documentation.   *See* [Doc. 47-3 at 135:20–136:13].   And although Plaintiff faults Mr. Heinz for failing to provide documentation supporting his reasons for issuing the February 2016 Progressive Discipline Form, Mr. Heinz also observed that the form itself served to memorialize his bases for concluding that Mr. Miller had "made no serious attempt to complete the job requirements that [Mr. Heinz] gave him in December of 2015."   *See* [Doc. 47-3 at 97:5–98:1].   Other than these examples, Mr. Miller merely cites his own conclusory statement that "Mr. Heinz never documented any aspect of his allegations in [Plaintiff's] evaluations" and "always just presented a laundry list of complaints without any proof," the March 2019 evaluation being no exception.   [Doc. 47-1 at ¶ 9].   Such statements cannot create a genuine dispute of material fact.   *Bones*, 366 F.3d at 875.

[14] Mr. Miller's subjective belief that the 2018–2019 Evaluation was "entirely baseless," [Doc. 47 at 4 (citing [Doc. 47-1 at ¶ 13])], cannot create a genuine dispute of material fact, *Bones*, 366 F.3d at 875; *cf. Sims v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1329 ("[A]n employee's own opinions about his qualifications do not give rise to a material factual dispute." (cleaned up)).   Nor will the Court consider counsel's assertion that the 2018–2019 Evaluation is "an example of the manner in which Mr. Miller was singled out for mistreatment" as undisputed fact.   *See, e.g.*, *Adler*, 144 F.3d at 671–72 (10th Cir. 1998); *see also* NYW Civ. Practice Standard 7.1D(b)(7).

[15] The Court does not consider as undisputed fact counsel's legal argument that the full or partial denials of merit increases are "adverse consequences" suffered by Mr. Miller.

34.     Plaintiff drafted the contents of the DAP, agreed that the expectations were appropriate, and signed it.  [Doc. 46 at ¶ 23; Doc. 47 at 4; Doc. 46-1 at 219:1–221:20].  Had Mr. Miller declined to agree to and sign the DAP, he would have faced termination.[16]  [Doc. 47 at 4; Doc. 48 at 2; Doc. 47-1 at ¶ 14].

35.     Plaintiff emailed Ms. Hartman and Ms. Banta on November 12, 2019, to express his concerns regarding what Mr. Miller described as "a growing unprofessional environment."  [Doc. 47-1 at 43–44]; *cf.* [Doc. 47 at 5; Doc. 46 at ¶ 35].  Ms. Hartman responded that same day, stating that she would be "happy to connect with [Plaintiff]" and that she had sent a meeting invite to Mr. Miller and Ms. Banta for November 13, 2019.  [Doc. 47-1 at 43]; *cf.* [Doc. 47 at 5; Doc. 46 at ¶ 35].

36.     On January 6, 2020, Mr. Heinz and Ms. Banta met with Mr. Miller to issue him a "Personal Accountability Final Memo" ("Final Memo").  [Doc. 46 at ¶ 24; Doc. 47 at 3; Doc. 46-1 at 225:12–228:8]; *see also* [Doc. 47-7 at 13–16].  As stated therein, NJH, via Mr. Heinz, believed Plaintiff was "continuing to not meet job expectations and [his] action

---

*See, e.g.*, *Adler*, 144 F.3d at 671–72 (10th Cir. 1998); *see also* NYW Civ. Practice Standard 7.1D(b)(7).

[16] Defendant argues that this and various other statements of fact asserted by Plaintiff in his Response are unsupported by admissible evidence and thus should not be considered on summary judgment, *see Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) (observing that a court may consider only admissible evidence in ruling on a motion for summary judgment, though the evidence need not be in a form that is admissible at trial), but has not further specified why any of the evidence Plaintiff cites in support is inadmissible, [Doc. 48 at 2 (asserting that Mr. Miller "attempts to qualify his admissions by . . . adding facts unsupported by admissible evidence")].  It is not this Court's job, however, to construct or select a party's arguments for it, and the Court declines to do so here.  *See, e.g.*, *KeyBank Nat'l Ass'n v. Williams*, No. 19-cv-03714-CMA-SKC, 2022 WL 4549473, at *2 (D. Colo. May 10, 2022) ("It is not this Court's job to find case law to support a party's motion."); *City of Albuquerque v. Soto Enters., Inc.*, No. 1:16-cv-00099-JAP-WPL, 2016 WL 9408547, at *3 n.2 (D.N.M. Apr. 11, 2016) ("It is simply not this Court's job to construct or select [a d]efendant's arguments for it.").

plan" in various ways.[17]   [Doc. 46 at ¶ 24; Doc. 47 at 3; Doc. 46-1 at 225:12–228:8]; *see also* [Doc. 47-7 at 13–16].   In the Final Memo, Mr. Heinz informed Plaintiff that his "employment [wa]s in jeopardy" and that "[c]ontinued non-compliance with [his] action plan and failure to meet the expectations of [his] role m[ight] result in separation."  [Doc. 47 at ¶ 71; Doc. 48 at ¶ 71; Doc. 47-7 at 15].   The Final Memo also explained that Mr. Miller's "eligibility to transfer to new opportunities within [NJH] w[ould] be restricted for twelve months."  [Doc. 47 at ¶ 72; Doc. 48 at ¶ 72; Doc. 47-7 at 15].

37.     In Mr. Heinz's view, as of the outset of the COVID-19 pandemic in March 2020, Mr. Miller had not met the expectations set forth in the Final Memo.  [Doc. 47 at ¶ 71; Doc. 48 at ¶ 71; Doc. 47-3 at 232:2–5].

38.     On March 23, 2020, Plaintiff was furloughed because of the COVID-19 pandemic.  [Doc. 46 at ¶ 26; Doc. 47 at 4; Doc. 46-1 at 228:180–229:17]; *see also* [Doc. 47-3 at 242:13–22].  No other members of Mr. Miller's team were furloughed.[18]  [Doc. 47 at 4; Doc. 31 at ¶ 103].

---

[17] Again, the Court does not consider Mr. Miller's belief that the Final Memo was "just the latest baseless step in NJH's discrimination and retaliation."  [Doc. 47 at 4]; *see, e.g.*, *supra* 12 n.14.

[18] In in its Answer to Plaintiff's Amended Complaint, NHS admitted that Ms. Le, Ms. Matzen, and Ms. Parr were not furloughed.  [Doc. 31 at ¶ 103].  Although NHS attempts to disclaim this statement now, *see* [Doc. 46 at ¶ 26], Defendant has not requested leave from this Court to withdraw or amend its admission, and therefore, it "is deemed conclusively established . . . and cannot be overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the summary judgment record," *Underberg v. United States*, 362 F. Supp. 2d 1278, 1238 (D.N.M. 2005) (quotation omitted); *see also Wells Fargo Bank, N.A. v. Mesh Suture, Inc.*, 31 F.4th 1300, 1313 (10th Cir. 2022) ("[C]ourts will not relieve a party from the conclusive effect of its judicial admission absent a showing of exceptional circumstances." (internal quotation marks omitted)); *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x 736, 739 (10th Cir. 2013) ("Admissions in the pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." (cleaned up)).

39.      Mr. Heinz was "not involved in NJH's decision to furlough employees."[19] [Doc. 46 at ¶ 27; Doc. 47 at 4; Doc. 46-3 at ¶¶ 2, 6–7].

40.      NJH implemented a COVID-19 Emergency Pay policy, effective April 13, 2020.  [Doc. 46 at ¶ 28; Doc. 47 at 4; Doc. 46-3 at ¶ 8].  Under the policy, employees in good standing were eligible to receive partial pay while furloughed.  [Doc. 46 at ¶ 28; Doc. 47 at 4; Doc. 46-3 at ¶ 9]; *see also* [Doc. 46-3 at 6].  Mr. Heinz did not determine the terms of the COVID-19 Emergency Pay policy.  [Doc. 46 at ¶ 30; Doc. 47 at 4; Doc. 46-3 at ¶ 10].

41.      Because Mr. Miller was not an employee in good standing at the time of his furlough, Plaintiff was not eligible for partial pay pursuant to the COVID-19 Emergency Pay policy.  [Doc. 46 at ¶ 29; Doc. 47 at 4; Doc. 46-1 at 233:15–235:12].[20]

42.      On June 15, 2020, Mr. Heinz and Ms. Banta exchanged emails in which Ms. Banta indicated that, if Mr. Miller refused to perform any of his assigned duties going

---

[19] Although he admits Ms. Murphy made this statement, Mr. Miller contends that "Mr. Heinz certainly gave input into who was furloughed among his team."  [Doc. 47 at 4].  As support for this factual assertion, Mr. Miller points only to his own statement that "[t]here can be no doubt that Mr. Heinz provided input to NJH as to which employee(s) on his team would be furloughed" because "as the supervisor, [he] certainly had some say in this decision-making process."  [*Id.* (citing [Doc. 47-1 at ¶ 18])].  Such conjecture, however, cannot create a genuine dispute of material fact.  *Bones*, 366 F.3d at 875; *see also Guyton v. Ottawa Truck Div., Kalmar Indus. U.S.A., Inc.*, 15 F. App'x 571, 578 n.4 (10th Cir. 2001) ("While an affidavit is certainly an appropriate vehicle to establish a fact for summary judgment purposes, the affidavit must set forth facts, not conclusory statements." (quoting *Bancoklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1101 (10th Cir. 1999))).

[20] The Court does not consider as undisputed fact counsel's argument that Plaintiff's ineligibility for partial pay or restricted eligibility to transfer to new opportunities within NJH amounted to "adverse consequences" for Mr. Miller.  *See* [Doc. 47 at ¶ 72]; *see also Adler*, 144 F.3d at 671–72; *see also* NYW Civ. Practice Standard 7.1D(b)(7)).  Similarly, the Court disregards counsel's argument that Mr. Miller's ineligibility for partial pay was "a direct result of NJH's previous adverse actions."  *See* [Doc. 47 at 4].

forward, Mr. Heinz could inform him that "this [wa]s probably not the right fit and [Mr. Heinz would be] happy to accept his resignation."  [Doc. 47 at 5; Doc. 47 at 2; Doc. 47-2 at 1].

43.    On or around June 30, 2020, NJH recalled Mr. Miller.[21]  [Doc. 46 at ¶ 33; Doc. 47 at 5; Doc. 46-1 at 237:18–238:13].  Specifically, the HR Department left Plaintiff a voicemail on his cell phone in which they stated they wanted to set up a meeting with Mr. Miller and "wanted [him] to come back to [NJH]."  [Doc. 46 at ¶ 33; Doc. 47 at 5; Doc. 46-1 at 237:18–238:13].

44.    Plaintiff never returned to work after he was furloughed.  [Doc. 46 at ¶ 33; Doc. 47 at 5; Doc. 46-1 at 266:7–8].

45.    After June 26, 2020, when Mr. Heinz was notified that Plaintiff was represented by counsel, Mr. Heinz had no further communications with Plaintiff and was not involved in any decisions related to his employment, including the dates Mr. Miller was requested to return to work.  [Doc. 46 at ¶ 34; Doc. 47 at 5; Doc. 46-3 at ¶ 11].  In early July 2020, Mr. Heinz exchanged a series of emails with HR as to Mr. Miller's employment status and whether or not Mr. Miller had returned to work.  [Doc. 47 at 5; Doc. 47 at 2; Doc. 47-2 at 2–4 (emails from the week of July 6, 2020)].

---

[21] In his Response, Mr. Miller neither specifically admits nor disputes whether he was recalled from furlough in June 2020.  Instead, he admits "that he received a voice message from NJH regarding Mr. Miller going to NJH's HR Department around June 30, 2020," and "further state[s]" that the "voice message did not specifically discuss a return-to-work from furlough or any details of reinstatement."  [Doc. 47 at 5.  In support of his partial admission (and presumably partial dispute), Plaintiff cites as evidence only his own statement that he "was not recalled from furlough in June 2020."  [*Id.* (citing [Doc. 47-1 at ¶ 20])].  The nonmoving party cannot rely on the mere "denial of an opponent's allegation" to defeat summary judgment, however, so the Court deems this fact undisputed.  *See* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (Apr. 2023 update).

46.     On July 6, 2020, at HR's request, Plaintiff sent Lisa Murphy ("Ms. Murphy"), Executive Director of HR, an email summarizing many of his complaints to date.  [Doc. 46 at ¶ 35; Doc. 47 at 5; Doc. 46-1 at 239:18–240:20 (Mr. Miller agreeing that the email summarized all of his "all of [his] complaints . . . at that point in time")]; *see also* [Doc. 46-1 at 45–50 (Mr. Miller's email, in which he responds to HR's request for his "current concerns")].  That email referenced, as pertinent here, emails that Mr. Miller sent to HR in January and February 2019 in which he complained that his annual evaluation was several months late, noted that his female counterparts were receiving timely evaluations and merit awards, and raised concerns about "growing, hostility, discrimination and retaliation that [he] was being subjected to by Mr. Heinz"; a meeting between Mr. Miller, Ms. Hartman, and Ms. Banta on November 13, 2019, following up on the email Plaintiff had sent on November 12, 2019, in which Mr. Miller "reiterat[ed] [his] growing concerns about the hostile work environment and retaliation to which [he] was being subjected by Mr. Heinz"; a meeting between Plaintiff, Ms. Hartman, Ms. Banta, and Mr. Heinz on December 16, 2019, during which Mr. Miller was told that he had to "fix [his] ways" immediately or face termination and Mr. Heinz became "violently angry" and "screamed" at Mr. Miller; and a December 18, 2019, email that Plaintiff sent to Mr. Heinz in which Mr. Miller "indicated he needed to take some time off, as [he] was experiencing health concerns."  [Doc. 46 at ¶ 35; Doc. 47 at 5 (stating that the "email speaks for itself"); Doc. 46-1 at 239:18–240:20]; *see also* [Doc. 46-1 at 45–50].

47.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 30, 2020.  [Doc. 20 at ¶ 114; Doc. 48 at 6].

48.     In a letter dated August 3, 2020, Ms. Murphy advised Plaintiff of the findings of her investigation into his complaints[22] as set forth in his July 6, 2020, email; again recalled Plaintiff from furlough; and asked Plaintiff to return to work in the position of Clinical Pathology Specialist on August 17, 2020.  [Doc. 46 at ¶ 37; Doc. 47 at 5; Doc. 46-1 at 259:22–261:9; *id.* at 52].  Additionally, HR requested that Plaintiff confirm he would be returning to work by August 12, 2020.  [Doc. 46 at ¶ 38; Doc. 47 at 5; Doc. 46-1 at 259:22–261:9; *id.* at 52].

49.     Plaintiff did not respond by August 12, so NJH extended the deadline.  [Doc. 46 at ¶ 38; Doc. 47 at 5; Doc. 46-1 at 263:15–264:6].

50.     Mr. Miller informed HR in an email dated August 13, 2020, that in order to return to work, he needed assurance that his work environment would be safe and proof that HR had investigated his complaints.  [Doc. 47 at 5; Doc. 48 at 2; Doc. 47-1 at ¶¶ 25, 82].

51.     When Mr. Miller did not return to work on August 17, 2020, NJH notified Plaintiff that it was accepting his resignation.  [Doc. 46 at ¶ 39; Doc. 47 at 5; Doc. 46-1 at 264:12–267:17; Doc. 46-3 at ¶ 12].

---

[22] Although Plaintiff "[d]enie[s] that any such investigation actually took place," he has not pointed to any evidence in the record to support this assertion beyond his own statement that "[i]t was entirely clear to [him] in August 2020 that Ms. Murphy had not engaged in any investigation of [Plaintiff's] complaints as she claimed to have done" because Ms. Murphy did not interview Mr. Miller and "Mr. Heinz admitted . . . that he had never discussed [Mr. Miller's] situation with Ms. Murphy until after [Plaintiff] had separated from NJH."  *See* [Doc. 47 at 5 (citing [Doc. 47-1 at ¶ 24])].  That Mr. Heinz had not met with Ms. Murphy as a part of her investigation, however, does not support a reasonable inference that such investigation did not take place or was inadequate and, as the Court has already pointed out, statements based on conjecture cannot create a dispute of material fact.  *See supra* 15 n.19 (citing *Bones*, 366 F.3d at 875); *see also Guyton*, 15 F. App'x at 578 n.4.

52.     Mr. Heinz was not involved in NJH's decision to accept Plaintiff's resignation.  [Doc. 46 at ¶ 40; Doc. 47 at 6; Doc. 46-3 at ¶¶ 11–12].[23]

53.     Although he could not recall the exact date, Mr. Heinz testified that he met with Ms. Murphy on one occasion to discuss Mr. Miller; this meeting, Mr. Heinz believed, took place after Mr. Miller's separation from NJH on August 17, 2020.[24]  [Doc. 47 at ¶ 80; Doc. 47-3 at 19:4–22:10].

54.     On or about August 31, 2021, the EEOC issued Mr. Miller a right-to-sue notice.  [Doc. 47 at ¶ 45; Doc. 48 at 3; Doc. 20 at ¶ 4; Doc. 31 at ¶ 4].

55.     On September 27, 2021, Mr. Heinz hired Todd Negri ("Mr. Negri"), a male Clinical Pathology Specialist, into Plaintiff's former department.  [Doc. 46 at ¶ 41; Doc. 47 at 6; Doc. 46-2 at 257:19–258:11].  Ms. Matzen took the position previously held by Mr. Miller.  [Doc. 47 at ¶ 49; Doc. 48 at 3; Doc. 31 at ¶ 122].

56.     Plaintiff initiated the instant action on November 23, 2021.  [Doc. 1].

57.     Before Mr. Negri was hired, Mr. Heinz had supervised a total of six employees at NJH:  Mr. Miller and five women.  [Doc. 47 at ¶ 46; Doc. 48 at 3; Doc. 47-4

---

[23] The Court does not consider Mr. Miller's subjective belief that "Mr. Heinz certainly had been awaiting the news of Mr. Miller's separation for years, and had engaged in a series of actions designed to accomplish that very result," which cannot create a dispute of material fact for summary judgment purposes.  *See* [Doc. 47 at 6]; *see also Bones*, 366 F.3d at 875.  Nor does the Court find any record support at this time for Mr. Miller's immaterial statement that Mr. Heinz "may have encouraged Mr. Miller to quit."  *See* [Doc. 47 at ¶ 79 (citing [Doc. 47-3 at 56:14–57:14, 132:24–133:8, 141:13–25, 153:25–154:20, 239:17–241:11])].  The Court notes that some of the cited portions of Mr. Heinz's deposition transcript were not submitted to this Court.

[24] Although NJH purportedly disputes this fact, it merely states that Mr. Heinz "did not really recall the time frame of his discussion with [Ms.] Murphy, but that it was after [Mr.] Miller's counsel entered an appearance and Miller 'started the [legal] process,'" both of which occurred after August 2020.  [Doc. 48 at ¶ 80 (quoting [Doc. 47-3 at 19:10–13])]; *see also* [Doc. 1 ("Complaint"), filed November 11, 2021].

at 7–8].  During the relevant period, Mr. Heinz's evaluations of his female employees were uniformly favorable, and he never wrote up any female employee.  [Doc. 47 at ¶ 47; Doc. 48 at 3; Doc. 47-3 at 33:25–35:10, 61:19–24].  Indeed, Mr. Miller was the only employee whom Mr. Heinz ever wrote up.  [Doc. 47 at ¶ 48; Doc. 48 at 3; Doc. 47-3 at 35:7–10].

58.    Additionally, on average, Mr. Heinz completed Mr. Miller's annual performance evaluations approximately five months late, whereas he completed Ms. Schuman's evaluations on time and was, on average, three months late in completing Ms. Aumen's evaluations.  [Doc. 47 at ¶ 50; Doc. 48 at 3; Doc. 47-4 at 8 (Answer to Interrogatory No. 10)].[25]  Mr. Heinz understood both that there are negative implications for an employee whose annual evaluation is delayed, [Doc. 47 at ¶ 51; Doc. 48 at 3; Doc. 47-8 at 1; Doc. 47-3 at 156:25–161:1], and that the annual evaluations dictate the merit increase, if any, for which an employee is eligible, [Doc. 47 at ¶ 57; Doc. 48 at 3; Doc. 47-3 at 80:18–81:1].

59.    Plaintiff identifies only Mr. Heinz—and not any other NJH employee—as harboring anti-male animus.  [Doc. 46 at ¶ 7; Doc. 47 at 2; Doc. 46-1 at 303:21–304:3].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[25] The Court observes that Defendant has objected to the Court's consideration of the first page of [Doc. 47-5], on the ground that it is an unauthenticated summary.  *See* [Doc. 48 at 3 n.1]; *see also Gross*, 53 F.3d at 1541 (observing that a court may consider only admissible evidence in ruling on a motion for summary judgment, though the evidence need not be in a form that is admissible at trial).  The Court finds, however, that NJH's answers to Plaintiff's interrogatory, *see* [Doc. 47-4 at 8], are sufficient to confirm the assertions of Mr. Heinz's average delays in returning Ms. Auman's, Ms. Schuman's, and Mr. Heinz's performance evaluations for purposes of resolving Defendant's Motion.

Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up).  In resolving a motion for summary judgment, the court reviews the evidence in the light most favorable to the nonmoving party, *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998), and must refrain from weighing evidence or making credibility determinations, *see Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).

The movant's burden on summary judgment changes depending on the party who bears the ultimate burden at trial.  A movant who will not bear the ultimate burden of persuasion at trial need not disprove the other party's claim; rather, the moving party must only point the Court to a lack of evidence for the other party on an essential element of that party's claim.  *Adler*, 144 F.3d at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  If, however, the movant has the burden of proof at trial, "a more stringent summary judgment standard applies."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  In such a case, the movant "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Id.*

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to set forth specific facts, supported by admissible evidence, showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To defeat summary judgment, the nonmovant cannot rely on arguments of counsel or conclusory statements based on speculation, conjecture, or subjective belief.  *See*

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (Apr. 2023 update) (explaining that the nonmovant cannot rely on "mere reargument of [his] case or the denial of an opponent's allegation" to defeat summary judgment).  Instead, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (cleaned up).

With this standard in mind, the Court turns to Defendant's Motion for Summary Judgment.

## ANALYSIS

## I.    Challenged Employment Conduct

Before proceeding to its substantive analysis, the Court first discusses what may qualify as challenged employment conduct for each of Plaintiff's claims.

***Disparate Treatment and Retaliation.***  A plaintiff's Title VII claims are generally limited to what is contained in a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter.  *See Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1170 (10th Cir. 2020).  Mr. Miller filed his Charge of Discrimination with the EEOC on July 30, 2020.  *Supra* ¶ 47.  Acts within 300 days of Plaintiff's filing of the Charge of Discrimination are thus timely and are properly within the right-to-sue letter Mr. Miller received from the EEOC on August 31, 2021.  *See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005); 42 U.S.C. § 2000e-5(e)(1); *see also* [Doc. 20 at ¶ 3; Doc. 48 at 6]; *supra* ¶ 54.  Thus, in this case, Plaintiff's disparate treatment and retaliation claims are limited to alleged unlawful employment actions taken

by NJH on or after October 4, 2019. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002) (explaining that, with respect to claims discrimination or retaliation under Title VII "only incidents that took place within the timely filing period are actionable"); *see also* [Doc. 20 at ¶ 128 (limiting challenged employment actions to those that occurred in October 2019 onward)]. Such relevant conduct is limited to: (1) the Personal Accountability Reminder Two, which Mr. Heinz issued to Mr. Miller on October 7, 2019; (2) the 2018–2019 Evaluation, which Mr. Heinz delivered to Plaintiff on October 29, 2019, and the corresponding DAP that Mr. Miller drafted and signed the same day; (3) the Final Memo, which was issued to Mr. Miller on January 6, 2020; (4) NJH's decision to furlough Mr. Miller; and (5) NJH's decision to accept Mr. Miller's resignation from NJH (collectively, "Challenged Employment Conduct").[26]

*Hostile Work Environment.* Although Title VII "preludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," the Supreme Court has held that the statute allows for "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period . . . for the purposes of assessing liability, so long as an act contributing to that

---

[26] With respect to his reverse gender discrimination claim, Mr. Miller also challenges being required by Mr. Heinz to work longer hours without additional compensation following Ms. Aumen's and Ms. Schuman's departure from NJH. [Doc. 47 at 17 ("Mr. Miller's required increase in work absent compensation may also constitute an adverse action." (citation omitted))]; *see also* [*id.* at ¶ 74; Doc. 48 at ¶ 74; Doc. 47-3 at 205:8–21]. This allegation, however, was not plead in Plaintiff's Amended Complaint, *see* [Doc. 20 at ¶¶ 128 (listing the challenged employment decisions)], and "appear[s] to be offered now only in an effort to avoid summary judgment," *DePatco, Inc. v. Town of Dubois*, No. 2:17-cv-00082-SWS, 2018 WL 10399851, at *3 (D. Wyo. Dec. 13, 2018). A party may not amend its claims merely by arguing new facts and theories in opposition to a motion for summary judgment. *Id.* (collecting cases). Accordingly, this argument is not properly before the Court for purposes of NJH's Motion and the Court does not address it. *Id.*

hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 115–17.

## II.     Reverse Gender Discrimination:  Disparate Treatment

Title VII makes it unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by circumstantial evidence, following the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) ("A plaintiff may prove violation of Title VII . . . either by direct evidence of discrimination or by adhering to the burden-shifting framework of [*McDonnell Douglas*]." (cleaned up)).  The plaintiff has the ultimate burden of proving, either directly or indirectly, that the defendant intentionally discriminated against him.   *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

Pursuant to the *McDonnell Douglas* burden-shifting framework, a plaintiff who relies on circumstantial evidence must first prove a prima facie case of discrimination, whereupon the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the challenged employment decision, and if the employer meets that burden, then the burden shifts back to the plaintiff to show that the stated justification was pretextual. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).  To state a prima facie claim of discrimination, a plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he qualified for the position at issue, and (4) he was treated less favorably than others not in

the protected class.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Establishing a prima facie case "raises an inference of discrimination only because we

presume these acts, if otherwise unexplained, are more likely than not based on

consideration of impermissible factors."  *Argo*, 452 F.3d at 1201 (quotation omitted).

Although Mr. Miller does not allege that he is a member of a traditional protected

class, "Title VII's prohibition on discrimination protects members of both historically

disfavored groups and historically favored ones."  *Bradley v. Denver Health & Hosp.

Auth.*, 734 F. Supp. 2d 1186, 1194 (D. Colo. 2010).  In reverse discrimination cases like

this one, "the prima facie case under *McDonnell Douglas* must be adjusted to account for

the plaintiff's historically favored status."  *Dickerson v. Bd. of Trs. of Metro. State Univ. of

Denver*, No. 19-cv-02087-WJM-SKC, 2021 WL 492483, at *6 (D. Colo. Feb. 10, 2021).

To that end, a plaintiff claiming reverse discrimination "must, in lieu of showing that he

belongs to a protected group, establish background circumstances that support an

inference that the defendant is one of those unusual employers who discriminates against

the majority."  *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992).

Alternatively, a plaintiff may establish a prima facie case of reverse gender discrimination

by presenting indirect evidence sufficient to support a reasonable inference that but for

plaintiff's status the challenged decision would not have occurred.  *Dickerson*, 2021 WL

492483, at *6; *Notari*, 971 F.2d at 590.  If the plaintiff states a prima facie case of reverse

gender discrimination under either method, the remainder of the *McDonnell Douglas*

burden-shifting framework applies.  *Notari*, 971 F.2d at 590–91.

NJH first contends that it is entitled to summary judgment on Mr. Miller's reverse

gender discrimination claim, arguing that Plaintiff cannot demonstrate that NJH is one of

those unusual employers that discriminates against the majority.  [Doc. 46 at 10].  Even were he able to make that "threshold" showing, Defendant asserts, Mr. Miller cannot otherwise establish a prima facie case of reverse gender discrimination or demonstrate that NJH's non-discriminatory justifications for its actions are pretextual.  [*Id.* at 10–16].

For his part, Mr. Miller argues that he has provided either direct evidence of discrimination or sufficient indirect evidence to establish a prima facie case of reverse discrimination.  [Doc. 47 at 14–15].  Additionally, Plaintiff contends that, for purposes of his prima facie case, he has demonstrated that he suffered multiple adverse employment actions, and also argues he has established that NJH's cited justification for such actions was pretextual.  [*Id.* at 15–19].  Because Mr. Miller first addresses what he describes as direct evidence of discrimination, the Court follows suit.

### A.    No Direct Evidence of Discrimination

As noted above, the *McDonnell Douglas* burden-shifting framework does not apply when a plaintiff has presented direct evidence of discrimination.  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  The Tenth Circuit has explained that "[d]irect evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."  *Hall v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 476 F.3d 847, 854 (10th Cir. 2007) (quotation omitted).  In other words, "[d]irect evidence demonstrates on its face that the employment termination was discriminatory."  *Adamson*, 514 F.3d at 1145.  In contrast, "[c]ircumstantial evidence permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination that discrimination, in fact, has occurred."  *Id.*

Mr. Miller asserts that he has offered direct evidence of discrimination, namely that Mr. Heinz "repeatedly expressed a preference for female subordinates."  [Doc. 47 at 14].

This Court, however, finds that evidence of these statements is not direct evidence of discrimination, but rather indirect or circumstantial. *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (finding evidence that supervisor held belief "that women being better suited to some jobs than to others" did "not constitute direct evidence of discriminatory *conduct*"—rather the comments were "on their face expressions of [the supervisor's] personal opinion, and not an existing policy which itself constitute[d] discrimination"). Although Mr. Heinz's statements reflect his personal biases—and may serve as circumstantial or indirect evidence of gender discrimination—they do not prove, on their face, that gender was the cause of any of the Challenged Employment Conduct. *See id.* ("*Thurston* does not hold that the *McDonnell Douglas* shifting burdens do not apply where there is direct evidence of personal bias, but where there is direct evidence of discrimination." (quotation omitted)); *Furr v. AT & T Techs., Inc.*, 824 F.2d 1537, 1549 (10th Cir. 1987) ("The unsuccessful plaintiffs here, however, confuse their offer of specific instances of discriminatory statements, from which they then argue the determining cause of the employment decision may be inferred, with direct evidence that age was the cause of that decision."). As the Tenth Circuit has explained, "statements expressing a personal opinion, even when reflecting a personal bias or prejudice, do not constitute direct evidence of discrimination." *Mitchell v. City of Wichita*, 140 F. App'x 767, 778 (10th Cir. 2005) (quotation omitted).

"Proof by direct evidence requires evidence that the actual motive behind the [challenged employment action] was discriminatory animus," and "[e]vidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by

decisionmakers unrelated to the decisional process." *Id.* (quotation omitted).  In other words, "[t]he plaintiff must show that the employer actually relied on gender in making its decision." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013) (cleaned up).  The Tenth Circuit has "previously emphasized the importance of context and temporal proximity in determining whether comments reflecting personal bias qualify as direct evidence of discrimination." *Id.*; *see also Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007).

Mr. Miller has failed to adduce sufficient evidence linking Mr. Heinz's comments regarding his preference for female subordinates and desire to have an all-female staff, *see supra* ¶ 25, and the Challenged Employment Conduct.  First, Mr. Miller has not produced any evidence of context, so the Court cannot discern when these statements were made or whether they have any temporal proximity to any of the challenged employment actions.  *Compare Riggs*, 497 F.3d at 1118 (finding no direct evidence of discrimination where the plaintiff had not provided any evidence of context, preventing the court from determining whether the statements had nay temporal proximity to the plaintiff's termination), *with Tabor*, 703 F.3d at 1217 (finding that "statements by a decisionmaker during an interview expressing discriminatory beliefs about whether members of the plaintiff's protected class are capable of doing the job at issue" constituted direct evidence of discrimination).  And although Mr. Heinz could be described as the decisionmaker with respect to the Personal Accountability Reminder Two; the 2018–2019 Evaluation, in which Plaintiff was rated "unsuccessful"; the corresponding DAP; and the Final Memo, Plaintiff has not shown that Mr. Heinz's stated preference for female subordinates was related to decisional process with respect to any of this conduct.  *See*

[Doc. 47 at 14]; *cf. Mitchell*, 140 F. App'x at 778.  Indeed, Mr. Miller points to no evidence to connect Mr. Heinz's generalized comments about gender to any dissatisfaction with Mr. Miller's work.  *See Riggs*, 497 F.3d at 1118; *see also Heim v. Utah*, 8 F.3d 1541, 1546–47 (10th Cir. 1993) (finding that the plaintiff's direct supervisor's angry outburst in the context of the plaintiff's completion of her office duties—in which he said, "Fucking women, I hate having fucking women in the office"—was not direct evidence of discriminatory intent because, although inappropriate, it was addressed to women in general, not the plaintiff specifically).  As to Mr. Miller's furlough,[27] and ultimate separation from NJH,[28] it is undisputed that Mr. Heinz was not involved in the decisional process. *See supra* ¶¶ 39, 45, 52.  Such statements by a nondecisionmaker typically cannot establish that a particular decision was tainted by discriminatory animus.  *Mitchell*, 140 F. App'x at 778 (collecting cases).

Nor, the Court finds, do Mr. Heinz's statements to Mr. Miller that he wanted to hire Ms. Parr and Ms. Matzen for the two positions made available after Ms. Auman's and Ms. Shuman's departure and did not think Mr. Miller would be "a fit in the laboratory," *see supra* ¶ 24 (citing [Doc. 46-1 at 201:16–205:25]), constitute direct evidence of gender discrimination.  These comments, the Court concludes, do not reflect any animus towards

---

[27] As discussed above, *see supra* 15 n.19, the Court observes that it does not consider Mr. Miller's statement that "Mr. Heinz certainly gave input into who was furloughed among his team."  *See* [Doc. 47 at 4 (citing [Doc. 47-1 at ¶ 18 (Mr. Miller stating that "[t]here can be no doubt that Mr. Heinz provided input to NJH as to which employee(s) on his team would be furloughed" because "as the supervisor, [he] certainly had some say in this decision-making process")])].

[28] That Mr. Heinz was in contact with HR during late June and early July 2020 regarding Mr. Miller's employment status does not support a reasonable inference that he was involved in the decisionmaking process regarding Mr. Miller's furlough or HR's ultimate decision to accept Mr. Miller's resignation.  *See supra* ¶¶ 42, 45 (citing [Doc. 47-2 (emails from June 15, 2020, and the week of July 6, 2020)])].

men on Mr. Heinz's part, but rather, Mr. Heinz's animus toward Mr. Miller.  *See Mitchell*, 140 F. App'x at 778 ("Proof by direct evidence requires evidence that the actual motive behind the [challenged employment action] was *discriminatory* animus." (emphasis added)).

Finally, there is no evidence in the record that NJH had any type of uniform policy to treat women more favorably than men in the hiring and evaluation process that was discriminatory on its face.  *See EEOC v. Jetstream Ground Servs., Inc.*, No. 13-cv-02340-CMA-KMT, 2016 WL 879625, at *6 (D. Colo. Mar. 8, 2016) (citing *Thurston*, 469 U.S. at 121); *Ramsey*, 907 F.2d at 1008.  Thus, lacking direct evidence of discrimination, the Court proceeds to examine Mr. Miller's reverse gender discrimination claim under the *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Ramsey*, 907 F.2d at 1008–09.

### B.    Application of *McDonnell Douglas* Framework

Because Mr. Miller adduces no direct evidence of discrimination, and thus relies on circumstantial evidence, the *McDonnell Douglas* framework comes into play. *Adamson*, 514 F.3d at 1145.  Assuming without deciding that Mr. Miller has established a prima facie case of reverse gender discrimination, and viewing the record in the light most favorable to him, the Court finds that Plaintiff nevertheless has failed to put forth sufficient evidence to create a genuine dispute of material fact that NJH's legitimate, non-discriminatory reason for any adverse action was pretextual.

The establishment of the plaintiff's prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff.  *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999).  To rebut that presumption, the defendant must articulate a legitimate, nondiscriminatory reason for the challenged employment action.

*Id.* This burden of production is "exceedingly light"; the defendant "need only produce admissible evidence with would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (quotations omitted). The employer "need not persuade the court that it was actually motivated by the proffered reasons," rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* (quotation omitted).

Once a defendant has offered a legitimate, neutral reason for its action, the burden shifts back to the plaintiff to provide evidence showing that such justification is pretextual by demonstrating that the "employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). Evidence of pretext may include, among other things: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating criteria); and the use of subjective criteria." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (cleaned up). In evaluating pretext, courts are mindful that the "relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301 (10th Cir. 1999), *overruled in part on other grounds by Morgan*, 536 U.S. at 105. Moreover, the court's "role is not to second guess [the] employer's business judgment." *Stover*, 382 F.3d at 1076.

## 1.    Legitimate Non-Discriminatory Reasons

For ease of analysis, the Court divides the relevant conduct into three categories: (1) pre-furlough evaluations and discipline (October 2019 to March 22, 2020); (2) furlough (March 23, 2020, to June 30, 2020); and (3) post-recall separation (June 30, 2020, onward).

**Pre-Furlough Conduct.**   First, NJH states that the pre-furlough negative evaluations and discipline that Mr. Miller received—in the form of the Personal Accountability Reminder Two, the 2018–2019 Evaluation and the corresponding DAP, and the Final Memo—were justified by Mr. Miller's long history of performance issues and complaints from coworkers.  [Doc. 46 at 15].  This non-discriminatory rationale, the Court finds, is legitimate and supported by undisputed evidence in the record.  *See supra* ¶¶ 7–9, 11–15, 17, 20, 31–33, 36–37.   As the Tenth Circuit has explained, "poor performance of job duties is 'the quintessential legitimate, nondiscriminatory reason' for discipline."  *Arabalo v. City of Denver*, 625 F. App'x 851, 863 (10th Cir. 2015) (quoting *Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012)).

**Furlough.**   Similarly, NJH asserts that its decision to furlough Mr. Miller, as opposed to other employees, in March 2020 was justified because, unlike his counterpart in the lab, Mr. Miller was more expensive and had performance issues.  [Doc. 46 at 15].

**Post-Recall Separation.**  Finally, NJH states that it ultimately accepted Mr. Miller's resignation when he did not return to work after multiple attempts to recall him.  *See* [*id.* at 13]; *see also supra* ¶¶ 43–44, 48–51.  Accordingly, the Court finds that NJH has met its "exceedingly light" burden to "produce admissible evidence with would allow the trier of fact rationally to conclude that the employment decision had not been motivated by

discriminatory animus," with respect to each of the challenged employment actions. *Anaeme*, 164 F.3d at 1279.

### 2.      Pretext

Thus, the burden returns to Mr. Miller to adduce evidence sufficient to create a genuine dispute of material fact as to whether NJH's offered reasons are "so inconsistent, implausible, incoherent, or contradictory that [they are] unworthy of belief." *Stover*, 382 F.3d at 1071. Plaintiff only addresses one of NJH's proffered justifications, namely that the pre-furlough and furlough decisions were justified because of Mr. Miller's demonstrated history of performance issues. *See* [Doc. 47 at 18–19 (not addressing NJH's statement that Mr. Miller was furloughed because he was more expensive than his counterpart or that NJH ultimately accepted Plaintiff's resignation because Mr. Miller did not return to work post-recall)]. As evidence of pretext, Plaintiff states that because "Mr. Heinz never followed up on his stated complaints," one could reasonably infer that Mr. Heinz's articulated concerns regarding Mr. Miller's performance were not genuine. [*Id.*]. Additionally, Mr. Miller asserts that evidence of Mr. Heinz's stated preference for female subordinates is "relevant to and could support a finding of pretext in this case." [*Id.* ("Given the current record—and the evidence reflecting his stated preference for female subordinates—[Mr. Heinz's] failure to take action on his many stated concerns indeed are probative of pretext.")].[29]

---

[29] To the extent Mr. Miller also seeks to rely on statistical data regarding favorable treatment of female employees in terms of the timeliness and positivity of their reviews or regarding Mr. Heinz's hiring decisions, *see* [Doc. 47 at 18 (citing "the current record" generally as evidence of pretext)]; *see also* [*id.* at 14–15 (discussing statistical evidence of discrimination)], the Court finds this argument is waived for failure to brief. *Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) (quoting *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of

Construing the evidence in the light most favorable to Mr. Miller, the Court finds that although there are examples of a lack of follow up on Mr. Heinz's part with respect to his evaluations and discipline of Mr. Miller, *see, e.g.*, *supra* ¶¶ 11, 13, 15, such evidence is insufficient to create a genuine issue of material fact as to pretext in light of the overwhelming undisputed evidence of Mr. Miller's history of performance issues, as documented by Mr. Heinz and Plaintiff's coworkers, and responsive action taken thereto. *See supra* ¶¶ 7–9, 11–15, 17, 20, 31–33, 36–37.   Furthermore, as noted above, Mr.

---

supporting authority or in the face of contrary authority, forfeits the point."); *see also Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir. 2022) (deeming argument waived for failure to brief).

Nevertheless, the Court finds any such arguments unavailing.  The Tenth Circuit has explained that in individual disparate treatment cases, statistical evidence of the employer's general practices is "considerably less probative" because "the focus is on how and why an employer treated a particular individual the way it did."  *Bullington*, 186 F.3d at 1319.  Furthermore, "because overall employment statistics have little bearing on the specific intentions of the employer in making particular hiring decisions, such statistical evidence will rarely suffice to rebut an employer's legitimate, nondiscriminatory reasons for a particular adverse employment action."  *Id.*  Accordingly, "[a]t the very least, in order to create an inference of pretext, a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115 (10th Cir. 2007) (emphasis and quotation omitted).

Here the Court finds the asserted statistics insufficient to allow a reasonable juror to infer that NJH's performance-based justification is pretextual.  Crucially, Plaintiff does not cite to any evidence demonstrating that the female employees in the lab were similarly situated to Mr. Miller in terms of the quality of their performance or because they had engaged in similar behavior warranting discipline.  *See id.* (observing that as "a matter of common sense," the "probative value of statistical evidence will also vary depending upon the degree of difference between the situations of the protected employees within the statistical data set and the employee seeking to utilize that data" and that "[t]he fact that a plaintiff is required to demonstrate pretext does not grant a jury license to second-guess all prior hiring, firing and disciplinary decisions no matter how attenuated they might be from the challenged action").  As such, the cited statistics do not address NJH's specific reason for the challenged employment actions, namely Mr. Miller's poor performance, and accordingly "shed little light on the central issue of the pretext analysis—the motive behind [NJH's decisions]."  *See Bullington*, 186 F.3d at 1319–20 (collecting cases).

Heinz's uncontextualized comments regarding his preference for women and his desire to work with Ms. Matzen and Ms. Parr do not go very far towards undermining NJH's proffered explanation in the face of this significant record of performance issues.  *See supra* 26–30.  Thus, even though Mr. Heinz's lack of follow up and isolated remarks could create "some suspicion," *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1312 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005), Mr. Miller has failed to adduce sufficient evidence "of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [NJH's] proffered legitimate reasons for its action[s] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [NJH] did not act for the asserted non-discriminatory reasons."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation omitted); *Jaramillo*, 427 F.3d 1312.  In so concluding, the Court is mindful that it "may not act as a super personnel department that second guesses [NJH's] business judgments."  *Jaramillo*, 427 F.3d at 1308.

Accordingly, NJH is entitled to summary judgment on Mr. Miller's reverse gender discrimination claim.

## III.   Hostile Work Environment

Similarly, Plaintiff's hostile work environment claim fails because Mr. Miller has not offered sufficient evidence establishing that he experienced gender-based harassment at any point while under Mr. Heinz's supervision.  *See* [Doc. 46 at 16–18; Doc. 48 at 10–11].

For a hostile environment claim to survive motion for summary judgment, the "plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Davis v. U.S. Postal Servic*e, 142 F.3d 1334, 1341 (10th Cir. 1998) (cleaned up).  Importantly, "[t]he plaintiff must produce evidence that [he] was the object of harassment because of h[is] gender."  *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).  In reviewing a motion for summary judgment on a plaintiff's hostile work environment claim, the district court must examine the totality of the circumstances.  *Id.* at 1262.

Although there is some record evidence of Mr. Heinz's hostility towards Mr. Miller, *see, e.g.*, *supra* ¶¶ 6, 10, 24, 27, 46; *see also* [Doc. 47 at 19 (citing [Doc. 47-1 at ¶¶ 46–48, 50–51, 62–64, 91–94])], Plaintiff has not adduced any evidence that the cited harassment was overtly gender based.[30, 31]  Indeed, Mr. Miller himself identifies reasons that are not gender-based for Mr. Heinz's animosity toward him.  *See supra* ¶ 23.  In the absence of any overt, gender-based hostility, this type of neutral conduct is not actionable under Title VII, which "is not a code of workplace conduct."  *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005); *see also Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994) ("If the nature of an employee's environment, however unpleasant,

---

[30] The only overt references to gender in any of the evidence of harassment cited by Mr. Miller are his own conclusory characterizations of the hostility directed at him by Mr. Heinz as being "directly motivated by [Mr. Miller's] male gender" and being "repeated, gender-based hostility," *see* [Doc. 47-1 at ¶¶ 91–94], which cannot create a genuine dispute of material fact for purposes of defeating summary judgment, *Bones*, 366 F.3d at 875.

[31] Plaintiff asserts, without any supporting legal authority, that Mr. Heinz's delays in issuing Mr. Miller's performance evaluations, negatively evaluating Plaintiff, and writing Plaintiff up created a hostile work environment.  [Doc. 47 at 19 (citing [Doc. 47-1 at ¶¶ 23, 91–92])].  This Court is not obligated to develop Mr. Miller's arguments or conduct legal research for him and declines to do so here.  *See Phoenix Ins. Co. v. Trinity Universal Ins. Co. of Kan.*, No. 12-cv-01553-REB-KLM, 2013 WL 4594529, at *2 (D. Colo. Aug. 29, 2013) ("It is not the Court's responsibility to conduct legal research in order to understand a party's argument, nor is the Court obligated to piece together support for an argument."); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself.").

is not due to h[is] gender, [he] has not been the victim of sex discrimination as a result of that environment."); *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("General harassment if not racial or [gender based] is not actionable.").

Furthermore, for the reasons described above, *see supra* 26–30, the Court does not agree with Mr. Miller that Mr. Heinz's remarks regarding his preference for female subordinates[32]—which are uncontextualized and do not relate Mr. Miller's gender to the cited instances of harassment—permit an inference that Mr. Heinz's hostility was motivated by discriminatory animus, even "when coupled with the statistics relating to [Mr. Heinz's] hiring and evaluation of subordinates," [Doc. 47 at 19]; *see also Azu v. Sam's Club, Inc.*, No. 18-cv-01956-RBJ, 2019 WL 5577948, at *7 (D. Colo. Oct. 29, 2019) ("Isolated or ambiguous comments, or stray remarks, are not material in showing that an employer's actions were based on discrimination." (quotation omitted)); *Hamann v. U.S. Dep't of the Interior*, No. 21-cv-02385-DDD-NRN, 2022 WL 2753431, at *5 (D. Colo. July 14, 2022), *report and recommendation adopted sub nom. Hamann v. Haaland*, 2023 WL 9101603 (D. Colo. Mar. 6, 2023) (same); *cf. Chavez*, 397 F.3d at 833 ("[W]hen a plaintiff

---

[32] Mr. Miller does not argue, nor does this Court find, that these comments themselves rose to the level of discriminatory harassment for purposes of Title VII.  *See* [Doc. 47 at 19]; *Hamann v. U.S. Dep't of the Interior*, No. 21-cv-02385-DDD-NRN, 2022 WL 2753431, at *5 (D. Colo. July 14, 2022), *report and recommendation adopted sub nom. Hamann v. Haaland*, 2023 WL 9101603 (D. Colo. Mar. 6, 2023) ("Not all offensive conduct is actionable as harassment; trivial offenses do not suffice."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (reviewing its caselaw on hostile work environment claims and observing that "[a] recuring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (cleaned up)). Rather, Plaintiff argues that the remarks permit an inference that the other cited instances of harassment were based on gender.  [Doc. 47 at 19 (asserting that Mr. Heinz's "repeated sex-based comments, coupled with the statistics relating to his hiring and evaluation of subordinates, establishes that his conduct was driven by gender bias.")].

introduces evidence of *both gender-based and gender-neutral harassment*, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct as the product of sex and gender hostility, then it is for the fact finder to decide whether such an inference should be drawn." (emphasis added) (cleaned up)).  But even if such an inference could be drawn, this Court concludes that Plaintiff has failed to adduce sufficient evidence that would allow a factfinder to conclude that Mr. Miller's workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  *Young v. Colo. Dep't of Corr.*, No. 23-1063, 2024 WL 1040625, at *4 (10th Cir. Mar. 11, 2024) (cleaned up).

Accordingly, the Court finds that NJH is entitled to summary judgment on Plaintiff's hostile workplace claim.

## IV.    Retaliation

Finally, NJH argues that it is entitled to summary judgment on Plaintiff's retaliation claim.  [Doc. 46 at 18–21].  This Court respectfully agrees.

"Title VII forbids retaliation against an employee because [he] has opposed any practice made unlawful by Title VII, or because [he] has participated in an investigation, proceeding, or hearing regarding a claim of discrimination."  *Tabor*, 703 F.3d at 1219 (cleaned up).  To make out a Title VII retaliation claim, a plaintiff must demonstrate "that retaliation played a part in the employment decision."  *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).

In the absence of direct evidence of retaliation, a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework.  *Tabor*, 703 F.3d at 1219.  Under this framework, the plaintiff must establish a prima facie case of retaliation by establishing

that (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there exists a causal connection between the protected activity and the materially adverse action.  *Argo*, 452 F.3d at 1203.  Unlike with discrimination claims, the requirements for a prima facie case of retaliation are not adjusted when a plaintiff's underlying opposition is to reverse discrimination.  *Id.*  If the plaintiff makes this showing, the burden shifts to the defendant to identify a legitimate, non-retaliatory basis for the adverse employment action. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015).  And if the employer can justify its actions, the Plaintiff has the final burden to adduce sufficient evidence that the defendant's explanation is "a pretext intended to conceal an impermissible retaliatory motive."  *Id.*

This Court again divides its discussion of Mr. Miller's retaliation claim into three parts:  pre-furlough conduct, furlough, and post-recall separation.

***Pre-Furlough Conduct.***   As to the pre-furlough period, NJH argues that Mr. Miller's various complaints to HR—as summarized in his July 6, 2020, email to Ms. Murphy—do not constitute protected activity under Title VII.  [Doc. 47 at 19–20].  No reasonable jury, NJH argues, could find that Plaintiff's complaints were grounded in some form of unlawful gender discrimination; rather Mr. Miller merely raised general complaints about Mr. Heinz's management style and having been treated unfairly, which do not amount to protected opposition to gender discrimination.  [*Id.* at 19 (citing, inter alia, *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202–03 (10th Cir. 2008) ("General complaints about company management and one's own negative performance evaluation will not suffice."))].   And even if any such complaints could be considered protected

activity, NJH contends, Mr. Miller cannot demonstrate that Mr. Heinz took a materially adverse action against him, nor can Plaintiff establish a causal connection between the protected activity and any such adverse action, because there is no evidence that Mr. Heinz was aware of any of Mr. Miller's complaints.  [*Id.* at 20]; *see also Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("To satisfy [the causal connection] element, a plaintiff must show that the individual who took adverse action against [him] knew of [his] protected activity." (quotation omitted)).

  ***Furlough and Post-Recall Separation.***  With respect to the furlough and post-recall periods, NJH argues, among other things, that Plaintiff did not engage in any protected activity proximate to its furlough decisions.  [Doc. 46 at 21].  And even if there were evidence of such protected complaints of gender discrimination, Defendant contends, it has established, with competent evidence, that its decisions to place Mr. Miller on furlough and keep him there until June 2020 were justified by the COVID-19 pandemic and the fact that Ms. Le, Plaintiff's counterpart at the lab, was "a less expensive and more versatile employee with no performance issues."  [*Id.*].  Finally, NJH asserts that Mr. Miller's treatment after he was recalled from furlough cannot, as a matter of law, serve as the basis of his retaliation claim because Plaintiff was not subjected to any materially adverse action; rather he was recalled to his job and chose not to return.  [*Id.* at 21–22 (citing *Clayton v. Dreamstyle Remodeling of Colo., LLC*, No. 20-cv-02096-KLM, 2022 WL 910957, at *15 (D. Colo. Mar. 28, 2022) ("[B]ecause [the plaintiff] effectively resigned, she cannot rely on a theory of actual discharge to prove her *prima facie* case."))].

In response, Plaintiff does not precisely distinguish between the three periods, but generally states that (1) he "repeatedly engaged in protected activity" by "specifically and regularly inform[ing] HR that his concerns were grounded in *discrimination, hostile work environment, and retaliation*"; (2) "[h]is constructive discharge occurred just days after he advised NJH of his EEOC Charge"; and (3) "[h]e has established a causal connection between his protected activity and the adverse actions that closely followed."[33]  [Doc. 47 at 20].  In support, Plaintiff points only to paragraphs of his Declaration without further analysis or citations to pertinent legal authority demonstrating that the statements contained therein establish a prima facie case of retaliation under Tenth Circuit precedent.  [*Id.*].  It is not the job of this Court to conduct legal research and develop arguments for Mr. Miller.  *See, e.g.*, *Phoenix Ins. Co. v. Trinity Universal Ins. Co. of Kan.*, No. 12-cv-01553-REB-KLM, 2013 WL 4594529, at *2 (D. Colo. Aug. 29, 2013); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015).  This failure to adequately brief and support his responses to NJH's arguments, the Court finds, is sufficient grounds to deem them waived.  *Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992); *see also Utahns for*

---

[33] Mr. Miller also contends that "NJH's inadequate/non-existent investigation of [his] concerns are also significant, as the failure to thoroughly collect and critically examine evidence supports an inference that NJH did not intend to reach a reasoned conclusion." [Doc. 47 at 20–21].  This argument has two flaws.  First, there is no competent evidence in the record supporting Plaintiff's claim that NJH failed to adequately investigate his complaints.  *Supra* 18 n.22.  Second, Mr. Miller has not explained, and the Court does not independently understand, how the alleged lack of investigation should factor into the Court's analysis of Mr. Miller's retaliation claim.  [Doc. 47 at 20–21].  The only case Plaintiff cites, *Truijillo v. University of Colorado Health Sciences Center*, 157 F.3d 1211, 1159 (10th Cir. 1998), upheld a district court's award of summary judgment to the defendant employer on the plaintiff's Title VII retaliation claim and in doing so, did not address any claim that the defendant failed to investigate complaints raised by the plaintiff.  Lacking adequate authority, the Court does not further address this argument.  *Cf. Soto Enters.*, 2016 WL 9408547, at *3 n.2 ("It is simply not this Court's job to construct or select Defendant's arguments for it.").

*Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir. 2022).
Nevertheless, even after construing Plaintiff's arguments in the light most favorable to
him, this Court finds them unavailing.

First, assuming that Mr. Miller engaged in protected activity before he was
furloughed in March 2020—via his communications with HR in April 2017, May 2018, or
January, February, March, April, and November 2019,[34] *see* [Doc. 47 at 20 (citing [Doc.
47-1 at ¶¶ 23, 43–44, 53, 59, 95)]—he has not pointed to any evidence in the record that
Mr. Heinz, who completed and signed the Personal Accountability Reminder Two, the
2018–2019 Evaluation (which triggered the corresponding DAP), and the Final Memo,
*see* [Doc. 47-6 at 8–14; Doc. 47-7 at 9–15], knew of such protected complaints of gender
discrimination, [Doc. 46 at 20 n.7].[35]  Thus, as a matter of law, Plaintiff cannot establish

---

[34] Mr. Miller appears to argue that he engaged in protected activity when he sent an email
to Mr. Heinz on December 18, 2019, or at the January 6, 2020, meeting when Mr. Heinz
and Ms. Banta delivered the Final Memo.  *See* [Doc. 47 at 20 (citing [Doc. 47-1 at ¶ 95
(stating that this email and meeting constituted examples of Mr. Miller's "complain[ing] to
HR and Academic Affairs regarding the gender-based discrimination and hostile work
environment that [he] was experiencing," even though Mr. Heinz does not work in HR)])].
Mr. Miller's conclusory statement that the December 18, 2019, email was an example of
his "complain[ing] to HR and Academic Affairs regarding the gender-based discrimination
and hostile work environment that [he] was experiencing," [Doc. 47-1 at ¶ 95], cannot
create a material dispute of fact, however, *see Bones*, 366 F.3d at 875, and, in his own
summary of the email to Ms. Murphy on July 6, 2020, Mr. Miller stated "[t]he email that I
sent to Mr. Heinz on December 18, 2019 indicated that I needed to take some time off,
as I was experiencing health concerns," [Doc. 46-1 at 48].  Thus, the Court finds that Mr.
Miller has not adduced sufficient evidence that the December 18, 2019, email relayed any
concerns regarding gender discrimination, retaliation, or hostile work environment as
opposed to merely stating that Mr. Miller intended to take time off for health reasons.
Furthermore, even had Mr. Miller engaged in protected opposition to discrimination at the
January 6, 2020, meeting, such protected activity cannot serve as a basis for his
retaliation claim with respect to the Final Memo, which was necessarily drafted before Mr.
Miller could have stated his concerns at the meeting in which the Final Memo was
delivered.  *Cf. Clayton*, 2022 WL 910957, at *17.

[35] The Court acknowledges that Ms. Banta, who was aware of the protected activity, was
present at the meeting in which the Final Memo was issued to Mr. Heinz.  *See supra* ¶ 36.

the requisite causal connection between his alleged protected activity and any materially adverse actions that occurred before his furlough.  *See Montes*, 497 F.3d at 1176.

Turning to the decisions related to Mr. Miller's furlough, the Court finds that, even assuming Mr. Miller can make a prima facie case of retaliation, Defendant has established, by competent evidence, that it had a non-retaliatory justification decision to furlough Mr. Miller, namely the onset of COVID-19 pandemic and the fact that Mr. Miller was more expensive than his counterpart, Ms. Le, and, unlike Ms. Le, had performance issues.  [Doc. 46 at 20]; *supra* ¶¶ 30, 38, 57; *cf. Larson*, 482 F. App'x at 350 ("[T]he record demonstrates that [the defendant] had a legitimate, non-discriminatory reason for the adverse action—[the plaintiff's] poor showing on the mid-year reviews."); *Pippin v. Burlington Res. Oil & Gas Co.*, 40 F.3d 1186, 1195 (10th Cir. 2006) (explaining that, in the context of age discrimination claims, the Tenth Circuit has "regularly affirmed grants of summary judgment for employers who based [reduction in force] terminations on employee rankings") (collecting cases).  As described above, *see supra* 33–35, the Court finds that Plaintiff has not adduced sufficient evidence "of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [NJH's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

---

Mr. Miller, however, has not argued that her presence at the meeting renders her a decisionmaker with respect to the Final Memo or demonstrates a causal connection between his protected complaints to HR and the decision to issue the Final Memo in 2020. *See generally* [Doc. 47 at 20–21 (not addressing NJH's argument that Mr. Heinz's lack of knowledge of any protected activity defeats Plaintiff's retaliation claim with respect to pre-furlough activity and stating only that Plaintiff "has established a causal connection between his protected activity and the adverse actions that closely followed")].  Thus, the Court deems any such argument waived.  *Cf. Chavez*, 397 F.3d at 838 (finding "sufficient grounds to deem the issue waived" where the plaintiff's brief did not specify "which actions comprise[d] the alleged retaliation"); *see also Phillips*, 956 F.2d at 953–54; *Utahns for Better Transp.*, 305 F.3d at 1169.

unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons," *Fye*, 516 F.3d at 1228 (quotation omitted).

Finally, the Court finds that Plaintiff has not adduced sufficient evidence to demonstrate a causal connection between his protected activity and a materially adverse employment action with respect to his ultimate separation from NJH. The undisputed facts are as follows: On July 6, 2020, Mr. Miller emailed Ms. Murphy detailing his all of his complaints to date, *supra* ¶ 46; on July 30, 2020, Plaintiff filed his Charge of Discrimination with the EEOC, *supra* ¶ 47; thereafter, on August 3, 2020, Ms. Murphy informed Mr. Miller as to the results of her investigation into his complaints and *asked him to return to work*, *supra* ¶ 48; when Mr. Miller did not report back to work, NJH then *extended the deadline for his return*, *supra* ¶ 49; and only after he did not return to work by the extended deadline did NJH inform Mr. Miller that it was accepting his resignation, *supra* ¶ 51. To summarize, after Mr. Miller engaged in protected opposition to discrimination on July 6 and July 30, 2020, he was asked multiple times to return to work and declined to do so. Plaintiff's effective resignation cannot constitute a materially adverse action taken by his employer. *Sampson v. Kane Is Able, Inc.*, 812 F. App'x 746, 749 (10th Cir. 2020) (finding that the plaintiff effectively resigned when his employer had repeatedly asked him to return to work and he chose not to and observing that "an actual discharge does not occur when the employee chooses to resign rather than work under undesirable conditions" (cleaned up)); *cf. Clayton*, 2022 WL 910957, at *18 ("Further, although [the plaintiff] argues that [her employer] 'forced' her to take an unpaid leave of absence, the uncontroverted evidence shows that [the plaintiff] made the decision to do

so herself, after taking time to consider her options and to discuss the matter with her husband.").

   And, to the extent Mr. Miller characterizes his effective resignation as a constructive discharge constituting an adverse action, *see* [Doc. 47 at 17, 20], the Court finds that Plaintiff has failed to raise a genuine dispute of material fact that his working conditions were so objectively difficult or intolerable that he had no other option but to quit. *See Clayton*, 2022 WL 910957, at *18 n.24; *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) ("The bar is quite high in [constructive discharge] cases: a plaintiff must show he had no other choice but to quit." (quotation omitted)). The Tenth Circuit has explained that "if an employee resigns of his 'own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged.'" *Sampson*, 812 F. App'x at 750 (quoting *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

   Here NJH recalled Mr. Miller multiple times, and only accepted his resignation after Plaintiff did not return to work. *Supra* ¶¶ 48–49, 51. On this record, the Court cannot conclude that Mr. Miller did not have "a free choice regarding his employment relationship." *Baca*, 398 F.3d at 1218. Rather, NJH "offered him a choice, and that choice would by no means have subjected him to an objectively intolerable working environment." *Id.* (quotation omitted); *Fischer v. Forestwood Co.*, 525 F.3d 972, 981 (10th Cir. 2008) ("[A]n employee cannot survive summary judgment [on the issue of constructive discharge] merely by producing evidence showing that working conditions were difficult or unpleasant.") (collecting cases); *cf. supra* 24–44. And although "a

perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify a finding of constructive discharge," *Sampson*, 812 F. App'x at 750 (cleaned up), it is undisputed that Mr. Miller was asked to return to his original position of Clinical Pathology Specialist, *supra* ¶ 48, and there is no evidence that in returning to NJH he would have had to accept a large pay cut or a great loss of responsibility, *see Sampson*, 812 F. App'x at 750–51 (finding that the plaintiff had not established constructive discharge where his employer had "repeatedly asked him to return as a lift-truck operator with a 6.7% pay cut and many of the same duties as a lead lift-truck operator" (quotation omitted)). Thus, the Court finds that no reasonable jury could conclude that "by its illegal discriminatory acts [NJH] made working conditions so difficult that a reasonable person in [Mr. Miller's] position would feel compelled to resign." *Garrett*, 305 F.3d at 1221 (cleaned up).

Mr. Miller's argument then seems to be that by failing to provide him with assurances "that his work environment would be safe and proof that HR had investigated his complaints," *see supra* ¶ 50, NJH retaliated against him. *Cf. Clayton*, 2022 WL 910957, at *18. But "courts have frequently held that an employer's failure . . . to take particular corrective action that the plaintiff desires, does not amount to a materially adverse employment action for purposes of establishing a *prima facie* retaliation case." *Id.* (collecting cases). Accordingly, on this record, the Court finds that Mr. Miller has not demonstrated that he suffered a materially adverse action following his protected activity, as is required to state a prima facie case of retaliation under Title VII.

For the foregoing reasons, the Court concludes that summary judgment in favor of NJH on Plaintiff's retaliation claim is appropriate.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)    Defendant's Motion for Summary Judgment [Doc. 46] is **GRANTED**;

(2)    Final judgment shall enter in favor of Defendant and against Plaintiff on all claims;

(3)    Defendant, as the prevailing party, shall be awarded its costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 54.1; and

(4)    The Clerk of Court is directed to **TERMINATE** this matter accordingly.

DATED:  March 20, 2024                    BY THE COURT:

                                          _____
                                          Nina Y. Wang
                                          United States District Judge